*In re* JOHN E. BLUME, Asserted to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. John E. Blume, Respondent-Appellant).

Second District No. 2—89—0729

Opinion filed May 8, 1990.

William E. Coffin, of Guardianship & Advocacy Commission, of Elgin, and Elizabeth Sircher, of Guardianship and Advocacy Commission, of Chicago, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Following a hearing on a petition for involuntary commitment held on July 7, 1989, respondent, John E. Blume, was ordered to be involuntarily admitted to a mental health facility of the Department of Mental Health and Developmental Disabilities. The trial court found that respondent was mentally ill due to a schizoaffective disorder and that respondent was unable to provide for his own basic physical needs so as to guard himself from physical harm.

Respondent appeals, arguing that: (1) he was inadequately represented by counsel when counsel was not appointed at the time the matter was set for hearing pursuant to section 3—805 of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1987, ch. 91½, par. 3—805); (2) the trial court erred in finding respondent subject to involuntary admission when a predispositional report outlining a treatment plan was not presented pursuant to section 3—810 of the Code (Ill. Rev. Stat. 1987, ch. 91½, par. 3—810); (3) the trial court erred in failing to order a determinative period of hospitalization; and (4) there was not clear and convincing evidence to support a finding that respondent was subject to involuntary admission based on his inability to care for himself. Because the hearing did not comply with statutory procedural requirements, we reverse the judgment of the circuit court.

Respondent, a 34-year-old male, was voluntarily admitted to the Elgin Mental Health Center (EMHC) on June 22, 1989. Apparently in response to respondent's written request for discharge on June 29, the State filed a petition for involuntary admission on July 5, 1989. The petition stated that respondent was mentally ill; because of his mental illness he was reasonably expected to inflict serious physical harm upon himself or another in the near future and was unable to provide for his basic physical needs so as to guard himself from serious harm; therefore, respondent was in need of immediate admission

to prevent such harm.

The petition further stated that respondent was last discharged on June 2, 1989, and went to the Commodore, a halfway house. After a few days there, he left and returned to his father's home, where he stopped taking his medication. Following a visit to his mother, he began wandering the streets. Upon his return to the hospital, respondent was partially decompensated; he was highly irritable, paranoid, and highly demanding as well as accusatory and verbally abusive. Though initially uncooperative in taking medication, his mental state improved noticeably since his admission. However, he remained unpredictable and not yet stabilized at the time the petition was filed. Two examination certificates were filed in support of the petition on July 6, 1989, alleging that, because of his schizoaffective disorder, defendant could not live independently and was unable to provide for his basic physical needs so as to guard himself against serious harm.

On July 7, 1989, the trial court entered an order *nunc pro tunc* which appointed the public defender's office to represent respondent at the involuntary admission hearings scheduled on the same day. The July 7 order filed in open court recited that it was *nunc pro tunc* to the date of the filing of the petition (July 5). The notices of hearing were filed on July 6, 1989.

At the hearing, William Schweisheimer, a unit psychologist, testified regarding respondent's readmission to the mental health facility. He stated that this was respondent's 46th admission. During his 45th admission, respondent had set a fire in the treatment unit where he was a patient. During his current admission, respondent was emotionally labile; he was quick to anger, demanding, hostile and paranoid. While he was able to take care of his personal hygiene, he was not capable of taking care of his medical and psychiatric needs. He lacked sufficient judgment and was still sufficiently impulsive so that, without close supervision, he would soon stop taking medication, quickly decompensate, and become a danger to others and to himself. He cycled rapidly and had not shown any consistent stability outside the hospital in years.

When asked about a treatment plan for respondent, the psychologist stated that it was their intent to further stabilize respondent's condition until he was ready to be discharged. Schweisheimer opined that respondent could probably be stabilized in two to four months. He did not believe respondent could function in the community without some kind of supervision and that, if a halfway house could not take him, it could take eight months or longer before he could be re-

turned to the community. On cross-examination, the psychologist stated that there was no commitment that a halfway house would take respondent back at this time.

Dr. Peter Gallagher, a board-certified psychiatrist, stated that respondent suffered from a schizoaffective disorder characterized by cyclical mood swings where he frequently became manic. He also became delusional. On June 28, he had an elevated mood, pressured speech, was irritable and very difficult to reason with. He was verbally and motorically agitated and very paranoid. Dr. Gallagher also stated that, once respondent was outside the hospital setting, he would quickly decompensate and not be able to exist in the community, his use of medication was tenuous, and he had nowhere to go. Dr. Gallagher agreed that it was possible that respondent could reasonably be expected to inflict serious injury upon himself or others and that, outside the hospital, respondent would quickly decompensate and would have to return to the hospital within a matter of hours. In Dr. Gallagher's opinion, respondent needed immediate involuntary hospitalization, and this was the least restrictive environment for respondent at that time. Dr. Gallagher believed that two weeks would be needed for stabilization; a halfway house would then be contacted.

Respondent testified that he left the Commodore house because he did not have control over his money. His money was at his father's house, where his belongings were. Respondent admitted that he had a drinking problem, and he understood that he could not drink alcohol while on medication. He believed his problem stemmed from the mixing of the two. Respondent believed he could take care of himself outside the hospital. He would seek outpatient care and would live with a friend. He thought that, as long as he stayed away from alcohol, he would stay on his medication.

The trial court found respondent subject to involuntary admission. On July 21, 1989, the Office of Guardianship and Advocacy Commission was appointed to represent respondent, and this timely appeal followed.

■ Respondent's first contention of error is that he was effectively denied his statutory right to the assistance of counsel when the trial court apparently appointed counsel on July 7, 1989, the day of the hearing, in an order *nunc pro tunc* purporting to have the appointment relate back to the date of the petition July 5, 1989. The State concedes that the order was improper as a *nunc pro tunc* order where there was no earlier order or judicial action in the record to which the *nunc pro tunc* order could relate back. A *nunc pro tunc*

order is a decree which the court enters in the present to make the record speak for something that was done previously. (*In re Marriage of Erickson* (1985), 136 Ill. App. 3d 907, 915.) Before such a corrective order is entered, it is necessary that there be evidence, without reliance on the judge's memory alone, that a prior judgment or order was actually rendered. (*Kooyenga v. Hertz Equipment Rentals, Inc.* (1979), 79 Ill. App. 3d 1051, 1056.) An order *nunc pro tunc* may not be used to correct judicial error or supply omitted judicial action (79 Ill. App. 3d at 1056), or to give a judgment retroactive effect (*Furth v. Furth* (1972), 5 Ill. App. 3d 73, 76).

■ Both parties agree that the only evidence of counsel's appointment is the *nunc pro tunc* order of July 7, the date of the hearing. However, counsel should have been appointed at a prior time when the matter was set for hearing. (Ill. Rev. Stat. 1987, ch. 91½, par. 3—805.) This would have been either July 5 or July 6. Prior decisions interpreting the provisions for the appointment of counsel have held that counsel for a respondent subject to involuntary admission must be appointed at the time the matter is set for hearing, not at the hearing itself. (*In re Johnson* (1989), 191 Ill. App. 3d 93, 95; *In re Walters* (1989), 183 Ill. App. 3d 452, 455; *In re Elkow* (1988), 167 Ill. App. 3d 187, 195.) The statute is clearly intended to give counsel time to prepare adequately for the defense of his client and to avoid later claims of ineffective assistance of counsel. (*Elkow*, 167 Ill. App. 3d at 195-96.) The failure to provide counsel in a timely manner consistent with section 3—805 of the Code (Ill. Rev. Stat. 1987, 91½, par. 3—805) is reversible error. *Walters*, 183 Ill. App. 3d at 455.

■ In the present case, where there is no evidence of a prior judicial action, the trial court's attempt to issue an order *nunc pro tunc* constitutes an implicit recognition that counsel should have been appointed earlier, at the time the matter was set for hearing. As respondent's liberty interests were at stake, the need for strict compliance with the statutory provisions was compelling. (See *Elkow*, 167 Ill. App. 3d at 193.) We find that the delay in appointing counsel is reversible error.

■ Addressing the respondent's second contention of error, we do not find sufficient evidence in the record that a predispositional report was presented. Such a report is required by section 3—810 of the Code (Ill. Rev. Stat. 1987, ch. 91½, par. 3—810). Schweisheimer did testify that he was aware of a plan of treatment to further stabilize respondent and that respondent needed supervision. Dr. Gallagher alluded also to the need for involuntary hospitalization for

the stabilization of respondent over a period of time, and he also emphasized the need for respondent to take appropriate levels of medication, presumably Lithium or Haldol. However, we find that, in this particular case, the oral testimony does not satisfy the statutorily mandated preparation of a report by the *facility director or such other person as the court may direct.* (Ill. Rev. Stat. 1987, ch. 91½, par. 3—810.) The Code requires the court to consider a report which includes "information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment." Ill. Rev. Stat. 1987, ch. 91½, par. 3—810.

Even though no formal report is evident in the record, the State maintains that the witnesses' testimony indicated that a treatment plan was formulated; thus, there was no prejudice to respondent. Alternatively, the State argues that the issue is waived by respondent's failure to bring the omission to the trial court's attention. We disagree on both points. We cannot equate the limited testimony of the witnesses regarding respondent's diagnosis and need for treatment with the detailed report required by the statute. The testimonial record does not sufficiently delineate the appropriateness and availability of alternative treatment settings. Less restrictive treatment environments, such as monitored outpatient treatment, were not seriously considered, although the remote possibility of a halfway house was mentioned. The testimonial record does not provide any social investigation and does not adequately specify, in behavioral terms, what respondent's problems, needs, treatment goals, and method of treatment should be. The testimony merely focuses on the diagnosis of respondent's condition and his need for hospitalization and medication to stabilize him over a period of time. We are persuaded that there was insufficient compliance with the statute. Additionally, there is *no* evidence that a formal report was prepared by the *facility director* or by a *person directed to do so by the court.*

■ While we surmise that a major contributing factor to the problem here is the level of State funding for mental health services and the resulting inadequate focus on outpatient services, the solution to the problem belongs more appropriately to the legislative and executive branches of government. (See M. Epstein, *Expanded Outpatient Services: Slowing the Revolving Door,* 78 Ill. B.J. 126-31 (1990).) Our remedy, in the present case, is limited to insistence on

compliance with the statutory requirements. In short, the statute does not suggest that substantial compliance would be sufficient, and we cannot condone the failure to prepare and present a formal report which was intended to assist the trial court in making a disposition. (See *In re Collins* (1981), 102 Ill. App. 3d 138, 144-45.) The rule of strict compliance with the statute applies here, and we find that the error in failing to comply with the statute was neither harmless nor waived. See *In re James* (1989), 191 Ill. App. 3d 352, 357.

██ █ The State suggests that the mootness doctrine applies to this case since the statutory 60-day duration of commitment has already passed. However, the mootness doctrine does not generally apply to involuntary commitment cases, and it should not be applied to effect a waiver of the issues where the application of the doctrine would prevent issues capable of repetition from ever being susceptible to appellate review. (*People v. Nunn* (1982), 108 Ill. App. 3d 169, 172-73; see also *People v. Meece* (1987), 162 Ill. App. 3d 658, 660.) We decline to apply the doctrine here.

██ We also agree with respondent that it is better practice for the trial court to specify in its order the duration of involuntary commitment, subject to any conditions the court might impose. However, in this case, we do not find this omission to constitute reversible error. See, *e.g.*, *In re Grimes* (1990), 193 Ill. App. 3d 119, 123.

We conclude that both the failure to appoint counsel in a timely manner and the failure to consider a sufficiently detailed, statutorily required, predispositional report constitute reversible error. In view of our disposition of the cause and the passage of time, we need not address respondent's other arguments.

The judgment of the circuit court of Kane County is reversed.

Reversed.

GEIGER and INGLIS, JJ., concur.