No. 3-07-0172

Filed March 4, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | |
|---|---|
| *In Re* ) | Appeal from the Circuit Court of |
| ) | of the 12th Judicial District, |
| ALAKA W., ) | Will County, Illinois, |
| Asserted to be a Person ) | |
| Subject to Involuntary Admission ) | |
| ) | |
| (The People of the State ) | |
| of Illinois, ) | |
| ) | |
| Petitioner-Appellee, ) | |
| ) | |
| ) | |
| v. ) | No. 07-MH-71 |
| ) | |
| ALAKA W., ) | The Honorable |
| ) | Robert Livas, |
| Respondent-Appellant). ) | Judge Presiding. |

PRESIDING JUSTICE McDADE delivered the opinion of the court:

In March 2007 the circuit court of Will County entered an order finding that respondent, Alaka W., is a person subject to involuntary admission and that she be hospitalized in Silver Cross Hospital. The court also ordered that respondent shall receive psychotropic medication for a period not to exceed 90 days. For the reasons that follow, we reverse.

BACKGROUND

Surrogate Guardian Services, guardian of the person of respondent, Alaka W., filed a

petition for involuntary admission of Alaka for psychological treatment. The petition alleged that Alaka W. is unable to care for her own basic physical needs due to mental illness. Two days later, Dr. Boddapati of Silver Cross Hospital filed a petition for the involuntary administration of psychotropic drugs. The circuit court of Will County assigned both petitions a single case number and the State filed a single notice of hearing.

Alaka is diagnosed with bipolar disorder, diabetes, and a thyroid condition. She takes medication for her diabetes. Alaka W. is a medical doctor. Alaka worked for the State of Illinois until her retirement in 2003. She receives a pension of $4,100 per month. Following retirement, Alaka volunteered with the American Cancer Society. She lived alone in Frankfort for the 2 1/2 years preceding the petition for involuntary admission. Alaka is currently in proceedings on a petition to dissolve her marriage.

Lauren Sherman is a social worker with Surrogate Guardian Services. She testified that Alaka hired a cab driver at $300 per day to drive her around and deliver various letters to different agencies and offices and to remove all of the cranks from her windows because she was afraid people were trying to break into her home. She did not previously know the driver. Alaka had also installed padlocks on her doors and secured her front door with a chain such that she could not exit the front door. Alaka told Sherman she wanted her home "debugged" and expressed concern about "devices" implanted into her body. A bank serves as guardian of Alaka's estate. The bank pays Sherman for her services from Alaka's estate.

Dr. Donna Jean Pohl is a clinical psychologist with Silver Cross Hospital. Pohl spoke with Alaka W. on one occasion but Alaka refused to answer the majority of Pohl's questions. Pohl stated that Alaka answered "'I don't care to comment' or "'no comment'" to most of her

-2-

questions. Pohl reviewed Alaka's chart and spoke with her social worker. Alaka expressed worry about people breaking into her home and "interfering" with her. Pohl testified that Alaka had all of her window cranks removed because she feared people breaking into her house Alaka also thought that her husband put a "device" in her body. Pohl described Alaka's worry as a paranoid ideation.

Based on all of the foregoing Pohl opined that Alaka suffers from either bipolar disorder or paranoid delusional disorder, but Pohl testified that she did not have enough information to make an accurate diagnosis of Alaka's condition at that time. Pohl concluded that Alaka cannot function in society without significant assistance, is unable to care for her basic physical needs, requires significant assistance and medication, and would have to be directed to make appointments and seek psychiatric care. Alaka is, however, eating and taking care of her basic hygienic needs. Pohl recommended Alaka remain hospitalized for two to three weeks.

Dr. Elsy DeVassy, a psychiatrist, testified for the State. DeVassy attempted to examine Alaka but Alaka refused. When DeVassy attempted to examine Alaka, Alaka had placed a piece of furniture in front of the door to her room to block access. Alaka removed the furniture after using the bathroom. DeVassy observed a pillowcase full of papers in Alaka's bathroom, as well as a blanket or towel. Alaka stated that she intended to sleep in the bathroom. Alaka eventually removed the items from the bathroom but DeVassy testified that her behavior in this regard suggested that Alaka was not in touch with reality and was psychotic. Alaka refused to speak with Dr. DeVassy. A review of Alaka's chart revealed, in Dr. DeVassy's opinion, that Alaka was not sleeping properly because she got a maximum of four to five hours sleep.

Alaka thought her husband implanted some type of device into her body and she believed

-3-

in the existence of mind-altering television and radio sites. Alaka also exhibited pressured speech, paranoia, and a flight of ideas. Alaka is not sleeping properly, which is a manic symptom. DeVassy opined that if left untreated Alaka's behaviors could become worse, which could lead a patient to a more psychotic state and pose additional danger to the patient.

DeVassy diagnosed Alaka with bipolar disorder with psychosis or schizo-affective disorder. DeVassy based her diagnosis on Alaka's chart, conversations with Alaka's nurses and her treating psychiatrist, as well as DeVassy's observations of Alaka when she attempted to examine her. DeVassy also considered that Alaka has been hospitalized in the past, had taken psychotropic medication in the past but stopped, and, according to her chart, had been showing behaviors suggestive of a possible manic episode with psychotic features.

In DeVassy's opinion Alaka's symptoms indicate a delusional system that DeVassy testified Alaka has acted upon. DeVassy testified that Alaka is becoming increasingly delusional. However on cross-examination DeVassy testified that the only delusional behavior she observed was the pillow in the bathroom and that Alaka had not shown any signs of threatening behavior. Alaka's behavior indicates she is attempting to protect herself. She does not seem to trust others.

DeVassy opined that Alaka is unable to care for her own basic physical needs because, for Alaka, psychotropic medication was a basic physical need and she refused to take them. She does, however, take her diabetes medication. DeVassy opined that Alaka lacks the capacity to make a reasoned decision about her treatment. DeVassy testified there was no less restrictive course of treatment other than hospitalization. DeVassy also testified to a list of medications the petition for involuntary administration of psychotropic drugs sought to have administered. These included Haldol, Lithium, Cogentin, Ativan, and Haldol Decanoate. DeVassy testified that the

-4-

benefits of the proposed medications clearly outweigh the harm and that she has explored less restrictive services and rejected them. DeVassy also testified that the hospital sought to have certain tests performed.

Alaka testified on her own behalf. She has been taking care of herself for the past 2 1/2 years. The papers she had with her in the hospital related to learning more about guardianship proceedings. She pays her own bills and has a driver's license. Alaka explained that she did hire a cab driver but she did so to have him drive her to Chicago for proceedings in probate court. This was to avoid $25 to $30 in parking fees. She proceeded in this way for four months. Alaka testified that the estate is worth $3.75 million and that she is entitled to $2 million of that amount. Alaka complained that she had to pay her guardian and testified that she could not afford to pay someone $95 to buy $20 worth of groceries. She began to suffer shoulder pain and hired the cab driver to run errands for her.

Alaka believes she was taken to the hospital as a result of her dissolution proceedings. She explained that her husband is also a doctor and that she was previously hospitalized where he worked as a result of his connections there. She and her husband are Indian, it is a male-dominated culture, and her husband did not want to part with any money. She has also been told that in their culture mental illness is the only grounds for divorce and that is why she was hospitalized. She also stated that she won an award in a lawsuit that is worth, in her estimation, "billions" but that her husband usurped the money from her.

Alaka took what she described as "very minimal" doses of Haldol and Lithium between 1980 and 1995. Her primary care physician discontinued the medications because of her thyroid condition. Alaka suffered severe side effects from those psychotropic drugs. The side effects

included tremors and myopathy. She also suffered muscle stiffness and became emaciated.

Following the hearing on both petitions, the circuit court of Will County ordered Alaka committed to Silver Cross Hospital and ordered the involuntary administration of psychotropic medication. The hospital discharged her seven days later.

ANALYSIS

At the outset, it must be noted that the trial court's order had a duration of 90 days and the hospital discharged Alaka seven days after her commitment. It would therefore appear that the instant appeal is moot. Nonetheless we will address the appeal on its merits pursuant to our supreme court's holding in *In re Barbara H.*, 183 Ill. 2d 482, 492, 702 N.E.2d 555, 559-60 (1998) ("To apply the mootness doctrine under these circumstances would mean that recipients of involuntary mental health services would be left without any legal recourse for challenging the circuit court's orders").

A. Compliance With Sections 3-807 and 2-107.1 of the Mental Health Code

Section 3-807 reads, in pertinent part, as follows: "No respondent may be found subject to involuntary admission unless at least one psychiatrist, clinical social worker, or clinical psychologist who has examined him testifies in person at the hearing." 405 ILCS 5/3-807 (West 2006). First, the parties dispute the appropriate standard of review. Alaka argues that this case involves a question of statutory construction. The question, she asserts, of whether the State complied with section 3-807 requires this court to "ascertain and give effect to the intent of the legislature" in enacting the statute, and, therefore, the appropriate standard of review is *de novo*. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59, 857 N.E.2d 229, 236 (2006). The State argues that there is no question as to the interpretation of the statute. Rather, the issue raises a question of fact as

-6-

to whether the expert witnesses who testified in this case had, in fact, examined Alaka. Therefore, they assert, the standard of review is whether the trial court's implicit finding that they did is against the manifest weight of the evidence. See *In re Moore*, 301 Ill. App. 3d 759, 764, 704 N.E.2d 442, 445 (1998) (on question of whether the evidence supported the court's finding that respondent was subject to involuntary admission, "[t]he correct standard of review is whether the judgment is against the manifest weight of the evidence").

In *Moore*, the respondent, in addition to arguing that the evidence was insufficient to support the circuit court's judgment, argued that the court erred in failing to dismiss the petition where the State did not cause a psychiatrist to examine him within 24 hours of his admission to the hospital as required by section 3-606 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-606 (West 2006)). The hospital admitted the respondent pursuant to the provisions of that section. The *Moore* court found that because the facts were not in dispute on that issue and the question presented was one of law, *de novo* review was appropriate. *Moore*, 301 Ill. App. 3d at 764, 704 N.E.2d at 445.

The question presented here is analogous to the question raised in *Moore* to which *de novo* review applied. Here, the facts are not in dispute. Alaka does not dispute what the expert witnesses did prior to their testimony. Her argument is simply that what they did do is insufficient to satisfy the "examination" requirement in section 3-807. Before she is committed, the State must present the testimony of an expert who has "examined" her. To resolve this issue, this court must determine what the legislature intended when it wrote that "[n]o respondent may be found subject to involuntary admission unless at least one [expert] *who has examined him* testifies in person at the hearing." (Emphasis added.) 405 ILCS 5/3-807 (West 2006). We must then apply

that legislative intent to the undisputed facts of this case. That is an exercise in statutory construction. See, *e.g.*, *In re Detention of Diestelhorst*, 307 Ill. App. 3d 123, 128, 716 N.E.2d 823, 827 (1999) ("In deciding what the legislature was trying to do when it passed [a] section *** of the [Mental Health Code], we are guided by a fundamental rule of statutory construction-to ascertain and give effect to the true intent and meaning of the legislature"). Because the facts are not in dispute and the question is purely one of law, Alaka is correct that the appropriate standard of review is *de novo*. See *Moore*, 301 Ill. App. 3d at 764, 704 N.E.2d at 445.

### 1. Compliance with Section 3-807

Alaka argues the State failed to comply with section 3-807 of the Mental Health Code because it relied on the testimony of two hospital staff who were unable to examine her. The State responds the evidence demonstrates that Dr. Pohl did, in fact, examine Alaka. Dr. Pohl never testified that Alaka refused to answer all of her questions. Further, the State relies upon Dr. Pohl's review of Alaka's chart and her conversations with people involved in Alaka's care, as well as Dr. Pohl's own testimony that she "examined" Alaka, to support its position that it complied with section 3-807.

Alaka cites on *In re Sharon L.N.*, 368 Ill. App. 3d 1177, 1182, 859 N.E.2d 627, 631 (2006), where the court reversed an order of involuntary commitment because, *inter alia*, the expert witness "attempted to interview respondent on one occasion but respondent refused." However, the respondent's refusal to submit to an examination was not the basis of the *Sharon L.N.* court's order reversing the commitment. Rather, the court noted that while the respondent's refusal to be examined forced the testifying witness to rely mainly on the respondent's hospital records regarding respondent's current condition, two other certified professionals were able to

personally examine respondent in connection with her current episode. The *Sharon L.N.* court found that because the State offered no explanation as to why it chose to rely on the witness who testified instead of the professionals who actually examined the respondent, it had to reverse the commitment order. *Sharon L.N.*, 368 Ill. App. 3d at 1182, 859 N.E.2d at 631.

This interpretation of the *Sharon L.N.* court's rationale is supported by its reliance on the supreme court's decision in *In re Michelle J.*, 209 Ill. 2d 428, 436, 808 N.E.2d 987, 991 (2004). In *Michelle J.*, the supreme court held that the evidence did not satisfy the requirements of section 3-807 where "a psychiatrist, a psychologist and a clinical social worker were all able to examine [the respondent] in time for the hearing" but the State chose instead to rely on the testimony of the chief psychologist where the respondent had been hospitalized but who did not examine the respondent. *Michelle J.*, 209 Ill. 2d at 436, 808 N.E.2d at 991. At the hearing, the psychologist testified that she had not been involved in the respondent's treatment and had not met with the respondent personally for purposes of the hearing. The psychologist did review the respondent's medical records and spoke with the staff where the respondent was hospitalized. The court found that the State relied on the chief psychologist's testimony as "simply a matter of administrative convenience" and that "[u]nder these circumstances, there is no legitimate basis for deviating from section 3-807's explicit requirements." *Michelle J.*, 209 Ill. 2d at 436, 808 N.E.2d at 991.

Moreover, in construing *Michelle J.*, the *Sharon L.N.* court found that "[i]t is not clear what the rule would be if the respondent simply refused to speak with the doctor assigned to examine him or her" because "[t]hat situation was not presented in *Michelle J.*, where [the respondent] was not incapable of being interviewed prior to the hearing, and workers who had personally interviewed [him] prior to the hearing were not called purely because of 'administrative

-9-

convenience.'" *Sharon L.N.*, 368 Ill. App. 3d at 1181-82, 859 N.E.2d at 631. *Sharon L.N.* also cited *In re David B.*, No. 367 Ill. App. 3d 1058, 1069 (2006), where the Fifth District held that "section 3-807 of the Code requires the examiner to attempt a personal interview but that if the respondent refuses or is intentionally uncooperative, then the statutory examination may be based on discussions with treating staff and a review of medical records."

Finally, *Sharon L.N.* also noted that in a case where the respondent simply refused to speak to the doctor assigned to examine her, the supreme court would likely follow Justice Thomas's special concurrence in *Michelle J.* Justice Thomas noted that in both cases before the court a physician familiar with the respondent's case attempted a personal interview with the respondent and the respondent refused to speak with the doctor. Justice Thomas held that in each case the court "should say that the State satisfied the requirement of an examination. In my opinion, no rule is workable other than one that requires the doctor to attempt a personal interview, but if the respondent refuses, then the statutory examination may be based on discussions with treating staff and a review of medical records." *Michelle J.*, 209 Ill. 2d at 442-43, 808 N.E.2 at 995 (Thomas, J., specially concurring).

Based on the foregoing, we need not determine, factually, whether Dr. Pohl "examined" Alaka for purposes of the statute. Even assuming, *arguendo*, Alaka refused examination, Dr. Pohl testified that she reviewed Alaka's records and spoke with staff at the hospital. Based on the foregoing authority, Dr. Pohl satisfied the requirements of an "examination" under the courts' interpretation of section 3-807. In light of Dr. Pohl's review of those records and conversations with staff as the basis of her testimony at Alaka's hearing, any alleged refusal to be examined is

-10-

insufficient to support a finding that the State failed to comply with section 3-807. Accordingly, Alaka's argument to the contrary must fail.

2. Compliance with Section 2-107.1

Next, Alaka argues the State failed to prove every element of section 2-107.1 of the Mental Health Code by clear and convincing evidence as required before the involuntary administration of psychotropic medication. Section 2-107.1 reads, in pertinent part, as follows:

"(4) Authorized involuntary treatment shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present. * * *

(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

-11-

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1 (a-5)(4) (West 2006).

More specifically, Alaka argues that the State failed to produce clear and convincing evidence that (a) the benefits of the treatment outweigh the harm and (b) she lacks the capacity to make a reasoned decision concerning treatment.

(a) Whether the State Proved That the Benefits of Treatment Outweigh the Harm

Alaka argues that to satisfy its burden, the State is required to produce evidence of the benefits of each medication it seeks to administer and the possible side effects of each medication. That evidence must be supported by fact and may not take the form of the expert's bare opinion. Alaka argues that, here, Dr. DeVassy opined generally that the proposed treatment outweighed the potential harm but did not testify as to what are the benefits or potential side effects of any of the five proposed medications.

The State responds by admitting that Dr. DeVassy did not testify as to the possible side effects of the drugs it sought to administer. However, the State argues that because Dr. DeVassy testified that without treatment Alaka's condition would worsen, and because Alaka was on one of the medications in the past without evidence that she suffered any ill side effects, the trial court had sufficient evidence from which to conclude the benefits of all five medications outweighed the harm.

Alaka cites *In re Louis S.*, 361 Ill. App. 3d 774, 782, 838 N.E.2d 226, 234 (2005), where the court reversed the trial court's order for the forced administration of psychotropic medication. The trial court's order listed one medication as the primary choice for the respondent's treatment and also listed several alternative medications. However, at the hearing on the petition, the expert testified as to the benefits and potential side effects of the primary medication only. Although the petition listed the alternative drugs, the expert testified to neither the benefits or possible side effects of the alternative medications nor to the dosages that would be used. *Louis S.*, 361 Ill. App. 3d at 781, 838 N.E.2d at 233. The court concluded that the testimony on the risks and benefits of the primary drug did not authorize the trial court "to order other drugs without similar testimony." *Louis S.*, 361 Ill. App. 3d at 782, 838 N.E.2d at 234.

We choose to follow the Fourth District's holding in *Louis S.* and hold that, to meet its burden under section 2-107.1(a-5)(4) of the Mental Health Code, the State must produce evidence of the benefits of each drug sought to be administered as well as the potential side effects of each drug. That interpretation in consistent with the plain language of the statute. The statute requires "clear and convincing evidence" that "the benefits of the treatment outweigh the harm." The State's only attempt to satisfy this burden was, in this case, with the opinion of an expert witness.

However, where an expert fails to support her opinion with specific facts or testimony as to the bases of those opinions, the court has held that her testimony alone is insufficient to satisfy the clear and convincing evidence standard. See *Michelle J.*, 209 Ill. 2d 428, 438, 808 N.E.2d 987, 992 (2004) ("If the State adduced no valid evidentiary basis for the relief it sought, it necessarily follows that it failed to establish its case by clear and convincing evidence"); *State*

*Bank of Countryside v. City of Chicago*, 287 Ill. App. 3d 904, 911, 679 N.E.2d 435, 440 (1997) (experts' testimony did not rise to the level of clear and convincing evidence where the experts did not adequately explain the bases for their opinions and where their opinions were largely unsupported).

Requiring specific evidence as to the benefits and risks of each medication at the hearing on a petition for the involuntary admission of psychotropic medication, so that the trial court may determine whether the State can demonstrate by clear and convincing evidence that the benefits of the proposed treatment outweigh the potential harm, is also consistent with the overall statutory scheme of the Mental Health Code. For example, section 2-102(a-5) requires that "[i]f the services include the administration of [psychotropic medication], the physician or the physician's designee shall advise the recipient, in writing, of the side effects, risks, and benefits of the treatment *** to the extent such advice is consistent with the recipient's ability to understand the information communicated." 405 ILCS 5/2-102(a-5) (West 2006). The court has noted, in discussing section 2-102(a-5), that "[b]efore a patient can make a reasoned decision about medication, 'it is first necessary to be informed about the risks and benefits of the proposed course of medicine.'" *Louis S.*, 361 Ill. App. 3d 774, 780, 838 N.E.2d at 232, quoting *In Re John R.*, 339 Ill. App. 3d 778, 783, 792 N.E.2d 350, 354 (2003). To require the State to present evidence of the risks and benefits of each medication it sought to have involuntarily administered would serve to provide the trial court the same information deemed necessary for a patient to make a "reasoned decision" as to whether the benefits of the proposed course of treatment outweigh the potential harm.

The State failed to produce evidence regarding the possible side effects of the drugs it sought to administer. Therefore, it failed to prove, by clear and convincing evidence, that the benefits of the treatment outweigh the harm as required by section 2-107.1 of the Mental Health Code. Accordingly, the trial court's order granting the petition for the involuntary admission of psychotropic medication is against the manifest weight of the evidence and must be reversed.

(b)Whether the State Proved Alaka Lacks the Capacity to Make a Reasoned Decision Concerning

Treatment

Although we need not reach the issue, we further find that the State failed to satisfy its burden to prove that Alaka lacks the capacity to make a reasoned decision concerning her treatment.

"[A] court should consider the following factors in determining whether an individual has the capacity to make a reasoned decision concerning the administration of psychotropic medication:

> (1) The person's knowledge that he has a choice to make;
>
> (2) The person's ability to understand the available options, their advantages and disadvantages;
>
> (3) Whether the commitment is voluntary or involuntary;
>
> (4) Whether the person has previously received the type of medication or treatment at issue;

-15-

(5) If the person has received similar treatment in the past, whether he can describe what happened as a result and how the effects were beneficial or harmful; and

(6) The absence of any interfering pathologic perceptions or beliefs or interfering emotional states which might prevent an understanding of legitimate risks and benefits.

None of these enumerated factors should be considered dispositive, and a court should consider any other relevant factors which it deems might be present." *In re Israel*, 278 Ill. App. 3d 24, 37, 664 N.E.2d 1032, 1040 (1996).

Alaka argues that the evidence, rather than showing that she lacked the capacity to make a reasoned decision concerning her treatment, instead demonstrates that she "knew she had a choice, and was refusing the medications." The State responds by admitting that "[i]t appeared respondent understood she had a choice to make as she refused to take the prescribed medication." The State then asserts that "respondent was unable to understand the available options as she refused to admit she had a mental illness." The State argues Alaka cannot make a reasoned decision concerning her treatment because she has "interfering pathological beliefs" about her condition and hospitalization.

The State's argument is unpersuasive. Taken to its natural conclusion, the allegation of mental illness alone would preclude a finding that the respondent can make a reasoned decision concerning treatment because the condition prevents making such a decision. If mental illness alone were sufficient for the court to find that one is unable to make reasoned decisions regarding treatment, it would be unnecessary in any case for the court to determine whether a respondent

-16-

can make such decisions.  This is not the current state of our law.  Instead, the presence or absence of any interfering pathologic perceptions or beliefs or interfering emotional states, which might prevent an understanding of legitimate risks and benefits of treatment, is but one factor the court is to consider in determining whether an individual has the capacity to make a reasoned decision concerning the administration of psychotropic medication.  No one factor is dispositive of the question.  *Israel*, 278 Ill. App. 3d at 37, 664 N.E.2d at 1040.

Here, the State admits that Alaka "knows she has a choice to make."  It admits she has the "ability to understand the available options, their advantages and disadvantages."  The State itself argued that Alaka would have knowledge of the potential side effects of the drugs because she has "previously received the type of medication or treatment at issue."  Moreover, Alaka can "describe what happened as a result [of taking the medication] and how the effects were beneficial or harmful."  Alaka testified she stopped taking the medication because of hyperthyroidism.  Accordingly, we find that the trial court's order is against the manifest weight of the evidence.  Contrary to the court's order, the evidence weighs greatly in favor of finding that Alaka has the capacity to make a reasoned decision concerning the administration of psychotropic medication.  Therefore, were it necessary to reach the issue, we would find that the trial court's order for the involuntary administration of psychotropic medication must be reversed.

Moreover, the State does not dispute that it failed to provide Alaka with written notice of the potential side effects of the proposed medication as required by the Mental Health Code.  405 ILCS 5/2-102(a-5) (West 2006) ("If the services include the administration of [psychotropic medication], the physician or the physician's designee *shall* advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment,

-17-

to the extent such advice is consistent with the recipient's ability to understand the information communicated" (emphasis added)).  For that reasons as well, the trial court's order would be reversed.

### B.  Alaka's Ability to Provide for Her Basic Physical Needs

Alaka argues that the evidence indicates that she can provide for her physical needs or, alternatively, that she has a guardian of her estate and person who is mandated to provide for her physical needs.  She argues that the experts failed to support their opinions with substantive facts and the trial court heard no testimony related to food, shelter, medical care, or finances.

> "Generally, the inability to care for oneself so as to guard against physical harm is found where one's illness substantially impairs her thought processes, perceptions, emotional stability, behavior, or ability to cope with life's ordinary demands.  [Citation.]  In making such a determination, a court should consider whether a person (1) can obtain her own food, shelter, or necessary medical care; (2) has a place to live or a family to assist him; (3) is able to function in society; and (4) has an understanding of money or a concern for it as a means of sustenance.  [Citation.]"  *In re Tuman*, 268 Ill. App. 3d 106, 112, 644 N.E.2d 56, 60 (1994).

First, Alaka argues the State failed to prove that she cannot obtain her own food.  Alaka points to her own testimony that she cannot afford to pay a guardian $95 dollars to buy $20 worth of food as indicative of the fact that she knows her need to purchase groceries and how much they cost.  Alaka also relies on Dr. Pohl's testimony that she assumes that Alaka eats,

-18-

because she ate while hospitalized. The State presented no evidence that she is underweight or malnourished. Her social worker, the only witness to have been in Alaka's home, did not testify to a lack of food in the home. Alternatively, Alaka notes that she was under guardianship at the time of the proceedings and that the guardian can obtain food if she cannot obtain it for herself.

Alaka asserts that Dr. Pohl's opinion that she is not capable of making decisions about her basic physical needs is based on Alaka's refusal to take psychotropic medication, which Dr. Pohl viewed as a basic physical need. However, Alaka argues, the refusal to take psychotropic medication is not a basis for commitment. In *In re Jakush*, 311 Ill. App. 3d 940, 946, 725 N.E.2d 785, 790 (2000), the court found that the "right to refuse psychotropic medication is guaranteed by statute and should not have been a ground for involuntary admission."

Next, Alaka argues the State failed to prove she cannot obtain shelter. Rather, the evidence shows that Alaka has a home that she has lived in, alone, for at least two years before the hearing. Dr. DeVassy admitted knowing nothing of Alaka's living situation, or for how long she lived and functioned by herself.

Finally, Alaka argues that the State failed to prove she cannot obtain needed medical care. Alaka is taking her diabetes medication. Although Dr. DeVassy opined Alaka is unable to care for her own basic physical needs, DeVassy based her opinion on an opinion that Alaka was not leading a normal life because she paid a taxi to run errands, rearranged her shutters, and refused psychotropic medication. According to Alaka, the only testimony on this point came from Dr. Pohl, who, when asked if Alaka can obtain necessary medical care, opined that someone would have to direct her to obtain psychiatric care and make those appointments for her.

-19-

In spite of Pohl's testimony, Alaka again argues that whether a respondent seeks treatment for mental health issues is not a basis for commitment. Instead, the issue is whether the respondent has medical needs that they are unable to take care of without assistance. She claims that her testimony indicates that she has a firm grasp of her financial affairs. She testified that she is on a fixed pension, cannot afford to pay a guardian to do her errands, and had hired someone to run errands at a lower cost than a guardian and to save money on parking fees. Alternatively, Alaka asserts that her understanding of the need for money as a method of obtaining food, shelter, or needed medical care was not an issue in this case because she had a guardian of her person and estate.

We agree that the State failed to elicit clear and convincing evidence that Alaka is unable to provide for her basic physical needs. Whether Alaka poses a threat to her own safety for reasons other than her ability to provide for her basic physical needs is not an issue in this case. Section 1-119 of the Mental Health Code defines a person subject to involuntary commitment as follows:

"(1) A person with mental illness and who because of his or her illness is reasonably expected to inflict serious physical harm upon himself or herself or another in the near future which may include threatening behavior or conduct that places another individual in reasonable expectation of being harmed; or

(2) A person with mental illness and who because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or outside help." 405 ILCS 5/1-119 (West 2006).

The State's petition to commit Alaka alleged only that she was "unable to provide for *** her basic physical needs so as to guard *** herself from serious harm." 405 ILCS 5/1-119(2) (West 2006). The State did not allege that Alaka, "because of *** her illness is reasonably expected to inflict serious physical harm upon *** herself." 405 ILCS 5/1-119(1) (West 2006).

The evidence of Alaka's arguably unusual behavior, *e.g.*, in hiring the cab driver or padlocking her door, does not establish that she is presently unable to provide for her basic physical needs and, therefore, does not itself satisfy the State's burden of proof. Even if her behavior does indicate a mental illness, "a finding of mental illness alone cannot sustain an order requiring commitment to a mental hospital for treatment." *In Re Love*, 48 Ill. App. 3d 517, 520, 363 N.E.2d 21, 24 (1977). Instead, "[t]o support an order of commitment for treatment, the State *** must submit an explicit medical opinion asserting that as a direct result of such mental illness, the person presently is unable to care for his physical well being. Additionally, the medical opinion must be based upon direct observation of the person's conduct." *Love*, 48 Ill. App. 3d at 520, 363 N.E.2d at 24.

The State alleged that Alaka is paranoid and delusional. The State presented no evidence that her alleged paranoia or delusions prevent her from obtaining food, shelter, or necessary medical care. Alaka is correct that the evidence is to the contrary in that she is presently obtaining all of those things. Her alleged illnesses have not deprived her of a place to live. Alaka has demonstrated an understanding of money and a concern for it as a means of sustenance in attempting to save money on travel to Chicago and in her expression of concern over guardianship costs. The only evidence to the contrary is, at worst, a misapprehension of the value

of her settlement. Although Alaka may be misinformed as to its value, even if she is, that misunderstanding does not indicate she does not understand the need for money.

The State presented no evidence that Alaka is unable to function in society other than her personal choice to secure her home against intruders. The State complains that this behavior places her at risk should there be an emergency in her home and rescuers are hindered in reaching her. This is pure speculation by the State. Thus, on its face, the State's argument is not based on a "medical opinion *** based upon direct observation of [Alaka's] conduct" (*Love*, 48 Ill. App. 3d at 520; *In re Nancy A.*, 344 Ill. App. 3d 540, 555, 801 N.E.2d 565, 580 (2003) ("For a medical opinion as to the existence of a mental illness to be clear and convincing, it is sufficient if the expert indicates the basis of his diagnosis by having directly observed a respondent on several occasions")) and cannot support an order of commitment for treatment.

The State failed to sustain its burden to prove that as a direct result of mental illness Alaka is unable to provide for her physical needs. *Cf. In re Rovelstad*, 281 Ill. App. 3d 956, 969, 667 N.E.2d 720, 728 (1996) (finding that the trial court's determination that respondent was subject to involuntary admission is against the manifest weight of the evidence where the expert "testified extensively and convincingly that respondent showed symptoms of mental illness" but her testimony regarding his ability to take care of himself [was] vague and conclusory"). See also *In Re Lillie M.*, 375 Ill. App. 3d 852, 857 (2007) ("in *Rovelstad,* the court found that evidence that a person has paranoid or delusional thoughts absent evidence that a person is reasonably likely to act on those thoughts to her own detriment is insufficient to warrant an involuntary admission"). As the allegation that Alaka is unable to provide for her basic physical needs formed the sole basis

of the State's petition, and is not supported by the evidence, we find that the trial court's order for involuntary commitment is against the manifest weight of the evidence.

C.  Compliance With Section 3-810 of the Mental Health Code

Next, Alaka argues that the State failed to file a dispositional report as required by section 3-810 of the Mental Health Code and, therefore, its order must be reversed.  Section 3-810 reads as follows:

"Before disposition is determined, the facility director or such other person as the court may direct shall prepare a written report including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order.  The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment. If the respondent is found subject to involuntary admission, the court shall consider the report in determining an appropriate disposition."  405 ILCS 5/3-810 (West 2006).

The appellate court has held:

"[I]n the context of section 3-810, *** cursory testimony is not a substitute for a treatment plan incorporated in a formal report.  (*In re Blume*, (1990), 197 Ill. App. 3d 552, 559 ('[T]he statute does not suggest that substantial compliance would be sufficient, and we

-23-

cannot condone the failure to prepare and present a formal report which was intended to assist the trial court in making a disposition'). The failure of the State to file a formal report which was prepared by the facility director or by a person directed to do so by the court results in an error which is neither harmless nor waived." *In re Lamb*, 202 Ill. App. 3d 725, 729-30, 560 N.E.2d 422, 425 (1990).

Alaka also cites *In re Watts*, 250 Ill. App. 3d 723, 727, 620 N.E.2d 640, 642 (1993), where the court held that the "[t]otal failure to comply with section 3-810 of the Code constitutes reversible error."

The State admits its failure to file the dispositional report required by section 3-810. Nonetheless, the State argues that because Alaka failed to object in the trial court to the failure to file the report, this court should consider the issue waived unless Alaka can show she was prejudiced by the State's error. The State cites *In re Robinson*, 151 Ill. 2d 126, 134, 601 N.E.2d 712, 717 (1992), where the supreme court held as follows:

"Where a respondent fails to object to the absence of a pre-dispositional report, strict compliance with section 3-810 is required only when the legislative intent cannot otherwise be achieved. [Citation.] Under these circumstances, we believe that oral testimony containing the information required by the statute can be an adequate substitute for the presentation of a formal,

written report prepared by the facility director or some other person authorized by the court."

In this case, unlike *Robinson*, the State did not present oral testimony containing the information required by the statute. *Cf. Robinson*, 151 Ill. 2d at 135, 601 N.E.2d at 717 ("the testimony of the State's expert witness made reference to all of the information required in a pre-dispositional report, and *** in the absence of an objection by the respondent, the purposes of section 3-810 were met in this case. Accordingly, the State's failure to present a formal pre-dispositional report prepared by the facility director or someone directed to do so by the court is harmless error"). The State claims that it presented sufficient evidence as to alternative treatment settings, social investigation, and the preliminary treatment plan to satisfy the purposes of the section 3-810 pre-dispositional report.

The supreme court held that the purpose of the report "is to provide trial judges certain information necessary for determining whether an individual is subject to involuntary admission to a mental health facility. Other purposes of the statute are to protect against unreasonable commitments and patient neglect, and to ensure adequate treatment for mental health care recipients." *Robinson*, 151 Ill. 2d at 133, 601 N.E.2d at 716. The court did not state, generally, precisely what information it would find satisfactory in oral testimony to supplant the section 3-810 report. Section 3-810 calls for specific information, including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, and a preliminary treatment plan describing the respondent's problems and needs, the treatment goals, and the proposed treatment methods, and a projected timetable for their attainment. 405 ILCS 5/3-810 (West 2006).

-25-

The State satisfies the requirements of section 3-810 absent a formal written report only when the testimony provides the specific information required by the language of the statute. This holding is consistent with *Robinson*, where the court specifically held that "oral testimony *containing the information required by the statute* can be an adequate substitute for the presentation of a formal, written report." (Emphasis added.) *Robinson*, 151 Ill. 2d at 134, 601 N.E.2d at 717. The oral testimony the State elicited at the hearing in this case did not provide all of the information required by section 3-810. The State's witnesses testified that no less restrictive course of treatment was available for Alaka other than hospitalization. This testimony was conclusory and unsupported by a factual basis. That is, the witnesses did not testify what alternative treatments may be available and why they were inappropriate in this case. The testimony did not provide the court with the information necessary to balance the competing interests involved in involuntary commitment. The testimony did not provide information on the treatment goals or a projected timetable for their attainment.

The State's failure to file the dispositional report required by section 3-810, and its failure to present oral testimony containing the information required to be in the report required by section 3-810, mandates reversal of the trial court's order. Therefore, we find, consistent with *Robinson*, that the State failed to comply with section 3-810 and reverse the trial court's order.

Although we find that our decision is consistent with the supreme court's holding in *Robinson*, we also take this opportunity to question the continuing validity of the decade--plus-old holding in *Robinson* and suggest that strict compliance with the requirements of section 3-810 is required. The supreme court has not addressed the question of strict compliance with section 3-810 since *Robinson*. However, since *Robinson*, the need for strict compliance with legislatively

-26-

established procedural safeguards against erroneous involuntary commitment has been repeatedly stated by the appellate court. Our decision is further persuaded by our finding that the case law demonstrates an unlikelihood that the court's concerns as to why strict compliance is required have been dissipated by improved procedures by the State.

For example, in *In Re Luttrell*, 261 Ill. App. 3d 221, 231, 633 N.E.2d 74, 81 (1994), the court wrote that:

> "Despite the significance and clarity of these procedural safeguards, the cases which have come before the courts of review indicate they are routinely disregarded by the State. ***
>
> As we have previously noted, involuntary commitment procedures represent the balance between an individual's liberty interests and society's dual interests in protecting itself from potentially dangerous individuals while protecting and caring for those who are unable to care for themselves. The total disregard for the legislatively established procedures is contrary to the balancing of interests established by the Code and should not be condoned."

See also *In re James*, 191 Ill. App. 3d 352, 356, 547 N.E.2d 759, 761-62 (1989), wherein the court wrote as follows:

> "Involuntary commitment procedures represent the balance between an individual's liberty interests and society's dual interests in protecting itself from potentially dangerous individuals while

-27-

protecting and caring for those who are unable to care for themselves. [Citation.] Thus, the procedures set forth in the Code are a legislative recognition that civil commitment is a deprivation of personal liberty. The purpose of the procedures is to provide adequate safeguards against unreasonable commitment. [Citation.] Inherent in the civil commitment process is the State's promise that the individual subject to admission will receive treatment. [Citations.] We agree with the *Collins* court's conclusion that a total failure to comply with the section evidences a disregard for the legislatively established procedures. It is contrary to the balancing of interests established by the Code and should not be condoned."

D. Proof that Hospitalization is the Least Restrictive Treatment Available

"[H]ospitalization may only be ordered if the State proves it is the least restrictive treatment alternative." *In Re Nancy A.*, 344 Ill. App. 3d 540, 556, 801 N.E.2d 565, 580 (2003). Alaka argues the trial court ignored "the doctrine of least restrictive alternative" and asserts that the record does not contain evidence regarding what specific treatment alternatives were available, which of those alternatives were investigated, and why those alternatives were not suitable. The State responds its witnesses opined that there was no less restrictive course of treatment for Alaka other than hospitalization. It then asserts that these opinions are supported by evidence of Alaka's behavior. The State points to no testimony concerning alternative treatments or why they are not available to Alaka.

-28-

The Fourth District recently noted that "[c]ase law is somewhat split on exactly how much evidence is required to support a finding that a given treatment is the least-restrictive alternative." *In re Lillie M.*, 375 Ill. App. 3d 852, 858 (2007). That court also found that "courts have required more than an expert's statement at hearing that the proposed treatment is the least-restrictive alternative, requiring that the expert's opinion be supported by further explanation." *Lillie M.*, 375 Ill. App. 3d at 858 citing *In Re Long,* 237 Ill. App. 3d 105, 112, 606 N.E.2d 1259, 1264 (1992) (Second District); *In re Lawrence S.,* 319 Ill. App. 3d 476, 484, 746 N.E.2d 769, 776 (2001) (Second District); *Luttrell,* 261 Ill. App. 3d 221, 227, 633 N.E.2d 74, 78-79 (1994) (Fourth District). See also *Nancy A.*, 344 Ill. App. 3d at 556, 801 N.E.2d at 580 ("The requirement that the State prove hospitalization is the least restrictive treatment alternative is not met merely because the State's expert opines commitment is the least restrictive means. The opinion of the expert must be supported by the evidence").

In *Lillie M.*, the State presented evidence concerning alternative treatment plans and expressed an opinion as to why they were not suitable for the respondent in that case. *Lillie M.*, 375 Ill. App. 3d at 859 ("opinion that hospitalization was the least restrictive alternative did not 'stand alone.' [Citation.] *** Despite these alternative treatment options, Dr. Shea still recommended hospitalization"). See also *In re Long*, 237 Ill. App. 3d 105, 112-13, 606 N.E.2d 1259, 1264 (1992) (concluding that "the trial court's finding that hospitalization was the least restrictive alternative is against the manifest weight of the evidence" where the psychiatrist failed "to determine whether another medication would be appropriate" and "State presented no evidence that respondent had been rejected by any alternative treatment program").

We hold, consistent with the weight of authority, that to satisfy the requirement to prove that hospitalization is the least restrictive alternative available for the respondent, the State is required to present evidence of what, if any, alternative treatments are available and why they are not suitable for the respondent. In this case, the State relied on the experts' conclusions that hospitalization was the least restrictive treatment option for Alaka without producing evidence concerning other, less restrictive, treatment options.

Accordingly, we hold that because the State failed to produce evidence of less restrictive treatment options, it failed to meet its burden of proof.

E. Combined Hearing on the Petitions for Involuntary Admission and Involuntary Administration

Finally, Alaka argues that the trial court failed to comply with section 2-107.1 of the Mental Health Code because it failed to conduct separate hearings on the petition for involuntary admission and the petition for involuntary treatment. Section 2-107.1 reads, in pertinent part, as follows:

> "The court shall hold a hearing within 7 days of the filing of the petition. *** The hearing shall be separate from a judicial proceeding held to determine whether a person is subject to involuntary admission but may be heard immediately preceding or following such a judicial proceeding and may be heard by the same trier of fact or law as in that judicial proceeding." 405 ILCS 5/2-107.1(a-5)(2) (West 2006).

The State responds that because Alaka failed to object to the joint hearing in the trial court, this court should consider the issue waived unless she can demonstrate that the joint hearing

-30-

prejudiced her. The State argues that Alaka was not prejudiced because the trial court considered separate evidence related to the petitions for involuntary commitment and treatment and issued separate orders on each petition.

The State cites *In Re Matter of Herbolsheimer*, 272 Ill. App. 3d 140, 143, 650 N.E.2d 287, 289 (1995), where this court found that "[n]either section 2-101 nor section 2-107.1 precludes both petitions from being considered in the same hearing." This court found that "the trial court made separate findings on the two petitions and relied on different evidence in its orders." *Herbolsheimer*, 272 Ill. App. 3d at 144, 650 N.E.2d at 290. The court held that the respondent's "due process rights were not infringed simply because the petitions were heard in a single proceeding." *Herbolsheimer*, 272 Ill. App. 3d at 144, 650 N.E.2d at 290.

The State admits that in *In Re Robinson*, 287 Ill. App. 3d 1088, 1092, 679 N.E.2d 818, 821 (1997), the court found that the decision in *Herbolsheimer* was not controlling because it was decided prior to the enactment of section 2-107.1(a)(2) of the Code expressly requiring separate hearings. However, the State argues that here, unlike in *Robinson*, it substantially complied with the separate hearing requirement because Alaka had notice of the proceedings on its petition for the involuntary administration of psychotropic medication and the trial court entered separate orders on each petition.

The *Robinson* court did base its decision on its finding that "where respondent had no notice of the administration of psychotropic medication proceedings, *** the 'separate' hearing requirement has been substantially complied with by the court entering separate findings on each petition." *Robinson*, 287 Ill. App. 3d at 1092, 679 N.E.2d at 821. Although the supreme court has not expressly overruled *Robinson*, it has stated that "the question of whether [a respondent]

should be admitted to the mental health facility should not have been heard at the same time as the court considered whether she should be given psychotropic medication against her will." *Barbara H.*, 183 Ill. 2d at 497-98, 702 N.E.2d at 562. The court found "[t]he joint hearing *** in direct violation of section 2-107.1(a)(2) of the Mental Health Code." *Barbara H.*, 183 Ill. 2d at 498, 702 N.E.2d at 562. The court noted that "[b]ecause involuntary administration of mental health services implicates fundamental liberty interests [citation], statutes governing the applicable procedures should be construed narrowly" and held that where those statutes are all but ignored, the appellate court is correct to reverse the circuit court's judgments. *Barbara H.*, 183 Ill. 2d at 498, 702 N.E.2d at 562.

We believe that *Barbara H.* is an expression of the supreme court's preference for strict compliance with statutes related to involuntary commitment and involuntary administration of psychotropic medication. That view is consistent with the supreme court's interpretation of other provisions in the Mental Health Code. Requiring strict compliance with statutory procedural safeguards is also necessary because of the "[f]ederal constitutionally protected liberty interest to refuse the administration of psychotropic drugs." *In re C.E.*, 161 Ill. 2d 200, 214, 641 N.E.2d 345, 351 (1994). As the appellate court has noted:

> "In mental health cases, strict compliance with statutory
> provisions is compelling, as liberty interests are involved. The
> Code's procedural safeguards are not mere technicalities, but
> essential tools to safeguard liberty interests of mental health
> patients. [Citation.] Thus, procedural safeguards are construed
> strictly in favor of the respondent. [Citation.] The failure to

-32-

comply with procedural rules requires the reversal of court orders authorizing involuntary treatment." *In re Cynthia S.*, 326 Ill. App. 3d 65, 69, 759 N.E.2d 1020, 1024 (2001).

In this case, the State admits that it failed to comply with the requirements of section 2-107.1, but it asks this court to find that it substantially complied with the statutory requirements and that substantial compliance is all that the statute requires. For the reasons discussed above, and consistent with the supreme court's holding in *Barbara H.*, we decline the State's invitation to find substantial compliance with section 2-107.1 sufficient to avoid reversal. Accordingly, we need not determine whether the hearings in this case substantially complied with the purpose of section 2-107.1. Because the State failed to strictly comply with section 2-107.1, reversal is the "correct" course of action. *Barbara H.*, 183 Ill. 2d at 498, 702 N.E.2d at 562.

CONCLUSION

Because the State (a) failed to satisfy its burden of proof under section 2-107.1 of the Mental Health Code, (b) failed to prove by clear and convincing evidence that the respondent is unable to provide for her basic physical needs, (c) failed to substantially comply with section 3-810 of the Mental Health Code, and (d) failed to prove that hospitalization is the least restrictive course of treatment, the circuit court of Will County's orders involuntarily admitting Alaka W. for treatment and for the administration of psychotropic medication are reversed. We further specifically hold that (1) strict compliance with section 2-107.1of the Mental Health Code is required, and that (2) evidence of alternative treatments and why

-33-

they are not suitable for the respondent is required to satisfy the State's burden of proof that hospitalization is the least restrictive form of treatment.

Reversed.

O'BRIEN, J., concurs.

JUSTICE SCHMIDT, concurring in part and dissenting in part:

I dissent from that portion of the opinion that finds the trial court's order for involuntary commitment to be against the manifest weight of the evidence. Otherwise, I concur.