2017 IL App (3d) 150164

Opinion filed April 4, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| | | |
|---|---|---|
| *In re* Amanda H. | ) | Appeal from the Circuit Court |
| (THE PEOPLE OF THE STATE | ) | of the 21st Judicial Circuit, |
| OF ILLINOIS, | ) | Kankakee County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-15-0164 |
| v. | ) | Circuit No. 15-MH-3 |
| | ) | |
| | ) | |
| AMANDA H., | ) | Honorable |
| | ) | Ronald J. Gerts, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Carter concurred with the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1     The respondent, Amanda H., appeals orders of the circuit court of Kankakee County, committing her involuntarily to a hospital for inpatient medical treatment and ordering the involuntary administration of psychotropic medication. Although those orders have expired, the respondent claims that the issues raised by this appeal fall within various exceptions to the mootness doctrine.

1

¶ 2         On the merits, the respondent argues that the circuit court's involuntary commitment order should be reversed and vacated because (1) the police officers who transported the respondent to the hospital were not identified as witnesses in the petition for involuntary admission, as required by section 3-606 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-606 (West 2014)), (2) the State neither filed a written predisposition report including information on the appropriateness and availability of alternative treatment settings nor presented evidence suggesting that involuntary commitment was the least restrictive available treatment for the respondent, in violation of section 3-810 of the Code (405 ILCS 5/3-810 (West 2014)), (3) the trial court failed to consider alternative available treatment settings before committing the respondent, in violation of section 3-811 of the Code (405 ILCS 5/3-811 (West 2014)), (4) the trial court committed the respondent based on an incorrect and outdated statutory standard, and (5) the State failed to prove that the respondent was subject to involuntary commitment by clear and convincing evidence.

¶ 3         The respondent also argues that the circuit court's involuntary medication order should be reversed and vacated because the involuntary commitment order was invalid. In the alternative, the respondent argues that the State failed to present any evidence supporting certain statutory prerequisites to an involuntary medication order under section 2-107.1 of the Code (405 ILCS 5/2-107.1 (West 2014)).

¶ 4                                            FACTS

¶ 5         On January 14, 2015, the State filed a petition for the involuntary admission of the respondent to the Riverside Medical Center (Riverside) for mental health treatment pursuant to the Code. The petition was completed and signed by the respondent's father, who lived with the respondent at the time together with the respondent's brother, Matthew. The petition stated that

2

the respondent (1) suffered from a mental illness, (2) had been yelling and threatening to kill herself at home, and (3) was in need of immediate hospitalization to prevent her from harming herself or others. The petition indicated that the respondent was not detained, taken into custody, or transported to Riverside by a peace officer.

¶ 6        Attached to the petition were written statements prepared Dr. David Teague and Dr. Mary Belford, psychiatrists at Riverside who treated the claimant upon her admission. In his statement, Dr. Teague noted that the respondent was brought to the emergency room by her family members, who reported that the respondent had made suicidal statements and were concerned that the respondent posed a risk to herself. Dr. Teague opined that the respondent was "[a] person with mental illness who, because of *** her illness [was] reasonably expected, unless treated on an inpatient basis, to engage in conduct placing [her] or another in physical harm or in reasonable expectation of being physically harmed." He noted that the respondent was "very guarded" while in the emergency room, and she believed that God was going to take her life. He concluded that the respondent was in need of involuntary inpatient admission and immediate hospitalization to prevent her from harming herself or others. In her written statement, Dr. Belford noted that the respondent was "paranoid and labile" and was "voic[ing] suicidal ideation." Dr. Belford agreed with Dr. Teague's diagnosis and recommendation of involuntary hospitalization and treatment. Dr. Belford stated that, due to her mental illness, the claimant was "unable to understand *** her need for treatment" and "unable to provide for *** her basic physical needs so as to guard *** herself from serious harm, without the assistance of family or others, unless treated on an inpatient basis."

¶ 7        On January 16, 2015, the State filed a petition for the involuntary administration of psychotropic medications. The petition alleged that the respondent lacked the ability to give

3

informed consent to psychotropic medication and that, because of her mental illness, the respondent was exhibiting "deterioration of the ability to function, suffering, or threatening behavior." The petition also alleged that "the benefits of [psychotropic medications] clearly outweigh[ed] the harm," that the respondent "lack[ed] the capacity to make a reasoned decision about the treatment," and that "other, less restrictive services were explored and found inappropriate." On January 27, 2016, the circuit court held hearings on both of the State's petitions.

¶ 8        During the involuntary admission hearing, the respondent's brother, Matthew, testified for the State. Matthew said that he had been living with the respondent at their father's home for the preceding two and one-half years. Although the respondent had previously worked as a nurse, Matthew noted that the respondent was unemployed during the time they lived together. During that time, the respondent talked to herself. According to Matthew, the respondent had never harmed herself or Matthew. However, she occasionally grabbed or struck Matthew when he tried to calm her down or help her stop pacing, talking fast, or screaming. Matthew testified that, during the time that they lived together, the respondent had been getting progressively worse. At some point, the respondent had a restraining order taken out against her by a neighbor, and she also had a no-contact order from the church she had attended.

¶ 9        Matthew testified that, approximately two days before the respondent was hospitalized, the respondent was in the shower at approximately 3:30 a.m. yelling and saying things that scared Matthew. On the morning of January 13, 2015, (the day the respondent was hospitalized), the respondent was going in and out of the bathroom talking to herself and said she was going to kill herself. Matthew called his father, who went to the police station. Shortly thereafter, paramedics and police arrived at the house. When asked how the respondent went to the hospital,

4

Matthew responded, "[t]hey had paramedics and cops come, and she didn't want to go and they had to force her." The respondent interjected comments during Matthew's testimony at various times.

¶ 10        Dr. Belford also testified for the State. Dr. Belford said that she was called to the emergency room at Riverside on January 13, 2015, after the respondent had been evaluated by the mental health technicians. Dr. Belford met with the respondent the following morning. According to Dr. Belford, the respondent "escalated very quickly" and was religiously preoccupied. The respondent told Dr. Belford that she received special messages from God. The emergency room report noted that the respondent had spoken of killing herself and said that God was going to kill her. The respondent told Dr. Belford that she had seen a Christian counselor once but had not liked the interaction and never returned. The respondent did not disclose any other prior mental health treatment. She was never previously hospitalized for mental illness. The respondent told Dr. Belford that she felt she had been physically abused by the police because the police had handcuffed her and brought her to the emergency room for fear that she was going to harm herself.

¶ 11        Dr. Belford testified that the respondent refused to acknowledge the possibility that she had a mental health diagnosis or needed mental health treatment. When Dr. Belford attempted to discuss the symptoms that brought the respondent to the emergency room, the respondent became "pressured in her speech" and her thoughts became disorganized. The respondent initially refused to have blood drawn because she believed it would be used to manipulate her to take medication. According to Dr. Belford, the respondent "escalated" while she was in the mental health unit. On one occasion, the respondent was given extra medication against her will when she became agitated and loud during a family visit because it was feared that the

5

respondent was going to "potentially get physically aggressive." The staff gave the respondent an intermuscular injection of Ativan, an anti-anxiety medication, which calmed her down.

¶ 12        Dr. Belford diagnosed the respondent with bipolar disorder, manic with psychosis. Dr. Belford stated that bipolar disorder usually causes extended periods of abnormal moods, including both depression and mania. Mania consists of irritability or euphoria and can include psychotic symptoms such as paranoia, grandiosity, racing thoughts, and difficulty concentrating. Mania can also involve poor sleep, poor hygiene, and an inability to care for oneself. It can result in suicide or aggressive homicidal outbursts. According to Dr. Belford, religious preoccupation, while not a mental disease in itself, can be a symptom of bipolar disorder, manic.

¶ 13        Dr. Belford testified that, since January 13, 2015, the respondent had been calmer, it took longer for her to "escalate," and she was better able to carry on a conversation. However, Dr. Belford noted that the respondent still refused to acknowledge the possibility that she had a mental illness and refused to consider taking medication. Moreover, the respondent continued to talk to herself and hallucinate, and she was still engaging in hyper-religious and paranoid behaviors. For example, the respondent believed that she was in a prison and that the staff was "against her" and trying to poison her. Dr. Belford conducted psychological testing on the respondent which indicated that she was "faking being healthy."

¶ 14        Dr. Belford opined that, if the respondent's psychosis was not treated, it would "continue to cause increased escalation." She noted that the respondent already had two restraining orders issued against her and that the respondent believed God was going to kill her or she was going to kill herself. Although Dr. Belford had never personally observed the respondent harm herself or another person, she opined that the respondent would either kill herself or harm someone else if her psychosis was not treated.

¶ 15    Dr. Belford asked the court to commit the respondent to Riverside for up to 90 days. When asked whether there was any less restrictive alternative, Dr. Belford responded, "[g]iven the fact she's refusing to cooperate with any treatment whatsoever I don't feel she would be cooperative in any outpatient setting."

¶ 16    The State did not submit a written predisposition report outlining a treatment plan and describing the availability and appropriateness of alternative treatment settings, as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2014)). The respondent's counsel did not object to the State's failure to submit a predisposition report or argue at trial that the information required by section 3-810 had not been adequately presented to the court.

¶ 17    The respondent testified on her own behalf. She stated that she was 29 years old and had lived with her father and brother for one and one-half years in Bourbonnais. After graduating from Wilmington High School and Joliet Junior College, the respondent had several jobs, including dancing and teaching dance. She subsequently graduated from Loyola University with a nursing degree and worked a as nurse at two hospitals. Her nursing courses included a semester of mental health training. She testified that she had a strong faith in God, felt God's involvement in her life, and prayed daily. However, she acknowledged that spiritual matters can be "confusing." She acknowledged being "stressed" about living at home and being unemployed. Although the respondent admitted that she may have screamed about killing herself five or six times during the previous year, she testified that she "never meant it" and that she had said it "[j]ust to show how stressed out" she was.

¶ 18    When asked how she came to be admitted to the hospital, the respondent stated that she was taken to the hospital "by ambulance by paramedics and cops" due to the concerns of her brother and father. She stated that the police forced her onto the stretcher, "put restraints" on her,

7

and seatbelted [her] in." The paramedics helped the police "strap [her] down." She felt "concerned for her welfare" and for her "salvation" when the police and paramedics restrained her "because of the stress it was causing."[1] The respondent testified that she did not want to be taken to the hospital that way and felt that it was unnecessary. She stated that she was a registered nurse and could have made the decision on her own and could have hired a counselor. Although she denied being mentally ill, the respondent noted that she could agree to see a counselor "before a doctor administers medication." She thought that anyone could benefit from counseling because "there are so many things that people deal with in this life" and "[t]his world falls short" due to the many sins in the world which "started with the fall of humanity."

¶ 19    The respondent acknowledged that she had two restraining orders taken out against her. She stated that she intended to "fight them" or "let them work their own problems out with [her] individually." She was not clear as to why the restraining order was filed by her neighbor, but she stated that the pastor's restraining order was based on his claim that the respondent had sent threatening e-mails. The respondent testified that she believed that the International House of Prayer was a "threat to a church," and "it needs to be proven in court that they're unsafe."

¶ 20    After hearing oral arguments, the trial court granted the State's petition for involuntary admission. It found that the respondent suffered from a mental illness and that it was proven by clear and convincing evidence that she was "in a position in which she may be a danger to herself and others." After hearing testimony and arguments on the State's petition for the involuntary administration of psychotropic medications, the trial judge granted that petition as well.

---

[1]On cross-examination, the claimant testified that this experience "tested" or "threatened" her faith because it "felt like imprisonment[,]" like they were "taking away [her] right *** to be on this earth," deeming her an "orphan," and taking away her right to make decisions on her own.

¶ 21    This appeal followed.

¶ 22                              ANALYSIS

¶ 23                              1. Mootness

¶ 24    The respondent argues that the trial court's orders granting the State's petitions for involuntary admission and involuntary administration of psychotropic medications must be reversed on various grounds. Before addressing the merits of the respondent's arguments, we must first address the threshold issue of mootness. The 90-day involuntary commitment order that is the subject of this appeal has already expired, and the respondent has been discharged from treatment. Accordingly, this appeal is moot. *In re Robert S.*, 213 Ill. 2d 30, 45 (2004); see also *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006) (an appeal is moot where it presents no actual controversy or where the issues raised in the trial court no longer exist, rendering it "impossible for the reviewing court to grant effectual relief to the complaining party").

¶ 25    Generally, courts of review do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected by the court's decision. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). However, there are three established exceptions to the mootness doctrine: (1) the "public-interest" exception, applicable where the case presents a question of public importance that will likely recur and whose answer will guide public officers in the performance of their duties, (2) the "capable-of-repetition" exception, applicable to cases involving events of short duration that are capable of repetition, yet evading review, and (3) the "collateral-consequences exception," applicable where the involuntary treatment order could return to plague the respondent in some future proceeding or could affect other aspects of the respondent's life. *Id.* at 355-63. Whether a particular appeal falls within one of these exceptions must be determined on a case-by-case basis, considering each exception in light of the relevant

9

facts and legal claims raised in the appeal. *Id.* at 355, 364; *In re Daryll C.*, 401 Ill. App. 3d 748, 752 (2010).

¶ 26    We hold that this case falls within the "capable of repetition" exception to the mootness doctrine. This exception applies when the complaining party demonstrates that (1) the challenged action is too short in duration to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998). In this case, there is no question that the first criterion has been met; the parties agree that the trial court's 90-day commitment and medication orders were of such short duration that they could not have been fully litigated prior to their cessation. Thus, the only question with regard to this exception is whether there is a reasonable expectation that the respondent will personally be subject to the same action again. *Alfred H.H.*, 233 Ill. 2d at 359.

¶ 27    To satisfy this criterion, there must be "a substantial likelihood that [an] issue presented in the instant case, and any resolution thereof, would have some bearing on a similar issue presented in a subsequent case" involving the respondent. *Id.* at 360. For example, if the respondent's appeal raises a constitutional issue or challenges the trial court's interpretation of a statute, the exception applies because the court's resolution of these issues could affect the respondent in subsequent commitment proceedings. *Id.*; see also *In re E.F.*, 2014 IL App (3d) 130814, ¶¶ 36-41; *In re Jonathan P.*, 399 Ill. App. 3d 396, 400-01 (2010). However, appeals that merely challenge the sufficiency of the evidence in a particular case will not suffice. *Alfred H.H.*, 233 Ill. 2d at 360.

¶ 28    Here, although the respondent challenges the sufficiency of the evidence, she also argues that the State's petition for involuntary admission must be reversed because the State did not

submit a predisposition report as required by 3-810 of the Code (405 ILCS 5/3-810 (West 2014)) or otherwise provide the information required by that section. In addition, she contends that the State's petition violated section 3-606 of the Code (405 ILCS 5/3-606 (West 2014)) because it failed to identify the police officers who transported her to the hospital. These arguments challenge the trial court's interpretation of some of the Code's requirements. It is reasonably likely that the resolution of these issues will affect future cases involving the respondent because the respondent might well be subject to involuntary commitment proceedings in the future and the trial court will likely commit the same alleged errors during those proceedings. *Jonathan P.*, 399 Ill. App. 3d at 401; see also *E.F.*, 2014 IL App (3d) 130814, ¶ 36; *In re Robin C.*, 395 Ill. App. 3d 958, 963-64 (2009) (applying the "capable of repetition" exception where the resolution of the respondent's statutory compliance issue would have some bearing on a subsequent case involving the respondent). Review is, therefore, appropriate under the "capable of repetition" exception to the mootness doctrine.

¶ 29        Moreover, respondent's argument that the State's petition for involuntary admission violated section 3-606 of the Code is also reviewable under the "public interest" exception to the mootness doctrine. This exception allows a court to consider an otherwise moot case when (1) the question presented is of a public nature, (2) there is a need for an authoritative determination for the future guidance of public officers, and (3) there is a likelihood of future recurrence of the question. *Alfred H.H.*, 233 Ill. 2d at 355; *In re James W.*, 2014 IL App (5th) 110495, ¶ 21. The exception is narrowly construed and applies only where a clear showing is made of each criterion. *Alfred H.H.*, 233 Ill. 2d at 355-56. Case-specific inquiries, such as the sufficiency of the evidence, do not implicate issues of a public nature. *In re Rita P.*, 2014 IL 115798, ¶ 36; *Alfred H.H.*, 233 Ill. 2d at 356. However, questions regarding compliance with the Code's

procedures "involve matters of substantial public concern." (Internal quotation marks omitted.) *Robert S.*, 213 Ill. 2d at 46; see also *Rita P.*, 2014 IL 115798, ¶ 36; *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1071 (2011). Moreover, there is a need for authoritative determination of the issue because no published decision addresses the specific question presented in this case, *i.e.*, whether section 3-606 of the Code requires a police officer to be identified in a petition for involuntary admission when the officer helped transport the respondent to the hospital at the request of the respondent's family and in conjunction with paramedics. This is an issue of first impression that will likely recur in future cases. Accordingly, deciding the merits of the respondent's argument on this issue will provide helpful guidance to circuit courts. *Rita P.*, 2014 IL 115798, ¶¶ 37-38; *Nicholas L.*, 407 Ill. App. 3d at 1071.

¶ 30       We now turn to the merits of the respondent's appeal.

¶ 31                    2. Violation of Section 3-606 of the Code

¶ 32       The respondent argues that the State's petition for involuntary admission violated section 3-606 of the Code (405 ILCS 5/3-606 (West 2014)) because it failed to identify the police officers who transported her to the hospital. Section 3-606 authorizes a peace officer to take a person into custody and transport her to a mental-health facility when the officer "has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." 405 ILCS 5/3-606 (West 2014). Upon arrival at the facility, the officer may complete a petition for involuntary admission. Section 3-606 provides that, if the officer does not complete the petition himself, "the transporting officer's name, badge number, and employer shall be included in the petition as a potential witness." In this case, the petition for involuntary admission was completed by the respondent's father, and it failed to identify the police officers who helped

12

transport the respondent to the hospital. The respondent argues that this omission constitutes reversible error.

¶ 33        The State argues that the respondent has forfeited this argument by failing to raise it before the trial court during the hearing. As the State correctly notes, a respondent forfeits an objection to any alleged procedural defects by failing to raise the objection at trial. *In re James H.*, 405 Ill. App. 3d 897, 904-05 (2010). However, forfeiture is a limitation on the parties, not on the court (*In re Joseph M.*, 405 Ill. App. 3d 1167, 1182 (2010)), and a reviewing court may ignore forfeiture in order to achieve a just result (see *In re Janet S.*, 305 Ill. App. 3d 318, 320 (1999); *In re DeLong*, 289 Ill. App. 3d 842, 844 (1997)). Our appellate court has repeatedly declined to find an argument forfeited when it implicates important liberty interests protected by the Code. See, *e.g.*, *Janet S.*, 305 Ill. App. 3d at 320; *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 21; *In re Katarzyna G.*, 2013 IL App (2d) 120807, ¶ 10. Accordingly, we will address the merits of the respondent's argument.

¶ 34        Because the Code protects liberty interests, strict compliance with statutory procedures is required. *In re Joseph P.*, 406 Ill. App. 3d 341, 348 (2010), *overruled on other grounds by Rita P.*, 2014 IL 115798; *In re Robin C.*, 385 Ill. App. 3d 523, 527 (2008). In determining the requirements of a statute and whether a respondent's statutory rights have been violated, our review is *de novo*. *In re Mary Ann P.*, 202 Ill. 2d 393, 404 (2002); *Joseph P.*, 406 Ill. App. 3d at 348, *overruled on other grounds by Rita P.*, 2014 IL 115798.

¶ 35        Here, there is ample evidence that police officers assisted in transporting the respondent to the hospital against her will. The respondent's brother testified that, after their father went to the police station, police and paramedics came to the house and "had to force" the respondent because she "didn't want to go" to the hospital. Dr. Belford testified that the respondent told her

13

that she felt that she was physically abused by the police, who had handcuffed her and brought her to the emergency room for fear that she was going to harm herself. The respondent testified that she was taken to the hospital in an ambulance "by paramedics and cops" due to the concerns of her brother and father. She stated that the police forced her onto the stretcher, "put restraints" on her, and "seatbelted her in." She claimed that the police strapped her down with the help of the paramedics. The respondent testified that she did not want to be taken to the hospital and felt that it was unnecessary, and she felt concerned for her welfare when the police and paramedics restrained her because of the stress it caused. Thus, although the process of involuntary commitment was initiated by the respondent's father and brother, the police played an active role in restraining the claimant and in transporting her to the hospital against her will.[2] Under these circumstances, we hold that section 3-606 required that the transporting officers' names, badge numbers, and employer(s) be identified in the petition for involuntary admission so that the officers could be called as potential witnesses. 405 ILCS 5/3-606 (West 2014). As noted, no such information was included in the petition filed in this case.

¶ 36     The State also argues that any violation of section 3-606 that occurred in this case was harmless. The failure to strictly comply with statutory procedures prescribed by the Code may be deemed harmless and may not require reversal in certain circumstances where the respondent (1) was not prejudiced by the errors and (2) failed to object to the errors at trial. *James H.*, 405 Ill. App. 3d at 904-05; *In re Karen E.*, 407 Ill. App. 3d 800, 812 (2011). However, we do not agree with the State that the omission of the transporting officer's names and contact information from the petition in this case may be presumed to be harmless. Failing to provide such information

---

[2]Presumably, the police officers involved took these actions based upon their independent judgment that the respondent was subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect her or others from physical harm, as contemplated by section 3-606.

14

deprived the respondent of using testimony by the transporting officers that may have been beneficial to her. See *Joseph P.*, 406 Ill. App. 3d at 348, *overruled on other grounds by Rita P.*, 2014 IL 115798. That resulted in potential prejudice to the respondent. *Id.*

¶ 37                     3. Violation of Sections 3-810 and 3-811 of the Code

¶ 38        The respondent also argues that the State's petition for involuntary admission must be reversed because the State did not submit a written predisposition report as required by section 3-810 of the Code (405 ILCS 5/3-810 (West 2014)) or otherwise provide the information required by that section. We agree. Section 3-810 provides:

> "Before disposition is determined, the facility director or such other person as the court may direct shall prepare a written report including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment. If the respondent is found subject to involuntary admission on an inpatient or outpatient basis, the court shall consider the report in determining an appropriate disposition." 405 ILCS 5/3-810 (West 2014).

¶ 39        Section 3-811 of the Code provides that, if a person is found subject to involuntary admission, "the court shall consider alternative mental health facilities which are appropriate for and available to the respondent, including but not limited to hospitalization. *** The court shall order the least restrictive alternative for treatment which is appropriate." 405 ILCS 5/3-811(a) (West 2014). Thus, sections 3-810 and 3-811 both require the court to consider alternatives to

15

treatment in an inpatient facility before involuntarily committing a person on an inpatient basis (405 ILCS 5/3-810, 3-811 (West 2014)), and section 3-811 requires the court to order the least restrictive available treatment alternative that is appropriate (405 ILCS 5/3-811(a) (West 2014)).

¶ 40    The purpose of section 3-810 is "to provide trial judges with the relevant information necessary to determine 'whether an individual is subject to involuntary admission to a mental health facility.' " *Daryll C.*, 401 Ill. App. 3d at 755-56 (quoting *In re Robinson*, 151 Ill. 2d 126, 133 (1992)). "Other purposes of the statute are to protect against unreasonable commitments and patient neglect, and to ensure adequate treatment for mental health care recipients." *Robinson*, 151 Ill. 2d at 133.

¶ 41    Although a written predisposition report is mandatory under section 3-810, our supreme court has held that strict compliance with that section is not required where (1) a respondent "fails to object to the absence of a predispositional report" and (2) the legislative intent can be achieved by other means. *Robinson*, 151 Ill. 2d at 134. Accordingly, when a respondent fails to object to the State's failure to present a predisposition report, "oral testimony containing the information required by the statute can be an adequate substitute" for the written report. *Id.*

¶ 42    However, "[t]he State satisfies the requirements of section 3-810 absent a formal written report *only when the testimony provides the specific information required by the language of the statute*." (Emphasis added.) *In re Alaka W.*, 379 Ill. App. 3d 251, 270 (2008); see also *Daryll C.*, 401 Ill. App. 3d at 756; *In re Daniel M.*, 387 Ill. App. 3d 418, 422 (2008). Thus, if the State fails to present any testimony regarding the availability and appropriateness of alternative treatment settings, or presents only conclusory testimony on these matters, an involuntary commitment order may not stand. See, *e.g.*, *Daryll C.*, 401 Ill. App. 3d at 756 (reversing involuntary commitment even though the respondent failed to object to the State's failure to present a

predisposition report where psychiatrist "did not testify regarding treatment alternatives to inpatient hospitalization that were available for the respondent and why he had rejected those alternatives in favor of hospitalization"); *Daniel M.*, 387 Ill. App. 3d at 423 (reversing involuntary commitment where, inter alia, the psychiatrist "summarily concluded that hospitalization was the least restrictive treatment alternative but did not testify as to what alternative treatments may have been available and why they were inappropriate"); *Alaka W.*, 379 Ill. App. 3d at 270-71 (reversing an involuntary commitment where the State failed to file a predisposition report and the State's witnesses' testimony that inpatient hospitalization was the least restrictive treatment option "was conclusory and unsupported by a factual basis" because the State did not present any testimony regarding the availability of alternative treatment settings and why they were inappropriate); *Robin C.*, 395 Ill. App. 3d at 964 (ruling that "we have repeatedly recognized that, in the context of section 3-810, cursory testimony is not an adequate substitute for \*\*\* a written discussion of treatment alternatives incorporated in a formal report"); *In re Lawrence S.*, 319 Ill. App. 3d 476, 484 (2001) (reversing an involuntary commitment order where two of the respondent's doctors each opined that commitment to a mental health facility was the least restrictive alternative, "but neither explained the basis for his or her opinion nor mentioned any other alternatives that were considered," and "[t]here was simply no testimony about the appropriateness and availability of alternative treatment settings"). Similarly, if the State fails to file a complete written predisposition report and also fails to present testimony outlining a treatment plan and identifying timetables for the treatment goals set forth in the treatment plan, the involuntary commitment order must be reversed. *Robin C.*, 395 Ill. App. 3d at 965; see also *Lawrence S.*, 319 Ill. App. 3d at 484.

17

¶ 43    In this case, it is undisputed that no written predisposition report was filed at the time of the hearing. However, the State argues that the respondent has "forfeited this issue by failing to raise it below." We disagree. As noted above, forfeiture is a limitation on the parties, not the reviewing court. Moreover, although a respondent may forfeit *strict compliance* with the requirements of section 3-810 by failing to object at trial, she retains the right to appeal the State's *total noncompliance* with those statutory requirements. In other words, by failing to object to the absence of a written predisposition report at trial, the respondent forfeits the right to obtain reversal on that basis alone. However, the respondent may still challenge the State's total failure to satisfy section 3-810's requirements by other means, *i.e.*, she may still argue on appeal that the State failed to present the information required by section 3-810 through oral testimony or some other evidence presented at trial. See, *e.g.*, *Robin C.*, 395 Ill. App. 3d at 965 ("The State's failure to meet the requirements of section 3-810 results in error which is neither harmless nor forfeited."); see also *Alaka W.*, 379 Ill. App. 3d at 269. Thus, the respondent has not forfeited any such argument in this case.

¶ 44    We hold that the State failed to comply with section 3-810's requirements in this case. Citing *Robinson*, 151 Ill. 2d at 134, the State correctly notes that "[o]ral testimony containing the information required by section 3-810 can be an adequate substitute for the presentation of a formal, written report *** where a respondent fails to object to the absence of such a predispositional report." However, that is the case "only when the testimony provides the specific information required by the language of the statute." *Alaka W.*, 379 Ill. App. 3d at 270; see also *Daryll C.*, 401 Ill. App. 3d at 756; *Daniel M.*, 387 Ill. App. 3d at 422. The State does not and cannot argue that the testimony presented at the hearing in this case provided all of the specific information required by section 3-810. When asked whether there was any alternative

treatment setting less restrictive than hospitalization at Riverside, Dr. Belford responded that she "didn't feel that [the respondent] would be cooperative in any outpatient setting," given that she was "refusing to cooperate with any treatment whatsoever." However, Dr. Belford did not identify any available alternative treatment settings that she had considered and explain why she had found them to be inappropriate. Nor did she adequately explain why she felt the claimant would not cooperate with treatment in those settings. Instead, Dr. Belford baldly asserted that, given the respondent's lack of cooperation at Riverside, she "didn't feel" that the respondent would be cooperative in a less restrictive, outpatient treatment setting. This type of cursory testimony on this issue is insufficient to satisfy the requirements of section 3-810. See, *e.g.*, *Robin C.*, 395 Ill. App. 3d at 964 ("we have repeatedly recognized that, in the context of section 3-810, cursory testimony is not an adequate substitute for *** a written discussion of treatment alternatives incorporated in a formal report"). Moreover, at no point in her testimony did Dr. Belford provide a detailed social investigation of the respondent, outline a treatment plan, or identify timetables for any treatment goals. Accordingly, the State failed to meet the requirements of section 3-810. See *Daryll C.*, 401 Ill. App. 3d at 756; *Robin C.*, 395 Ill. App. 3d at 965; *Alaka W.*, 379 Ill. App. 3d at 270; *Daniel M.*, 387 Ill. App. 3d at 423; *Lawrence S.*, 319 Ill. App. 3d at 484. As a result, the circuit court did not consider alternatives to treatment in an inpatient facility or order the least restrictive appropriate treatment, as required by sections 3-810 and 3-811.

¶ 45    In sum, because it presented neither a written predisposition report nor witness testimony detailing (1) what alternative treatments were available and why they were inappropriate in this case, (2) a treatment plan with timetables for treatment goals, and (3) a social investigation of the

respondent, the State failed to meet its burden of proof. The circuit court's granting of a commitment order under these circumstances was reversible error.

¶ 46    In *Alaka W.*, we suggested that strict compliance with section 3-810 should be required because, although we had repeatedly stated the need for strict compliance with legislatively established procedural safeguards for involuntary commitment proceedings, the case law indicated that the State continued to disregard those procedural safeguards. *Alaka W.*, 379 Ill. App. 3d at 271-72. We reiterated our call for strict compliance with the statute in *Daniel M.*, 387 Ill. App. 3d at 422-23, and other cases. Given the State's continuing disregard of both the statute and our prior pronouncements, we must once again stress the need for strict compliance with legislatively mandated procedural safeguards to protect and balance the competing interests of society and individuals subject to involuntary commitment.

¶ 47    Because we find that the trial court committed reversible error by granting an involuntary commitment petition in violation of sections 3-606, 3-810, and 3-811 of the Code, we do not need to address the respondent's remaining arguments on appeal.

¶ 48    Moreover, because we have reversed the trial court's order involuntarily admitting the claimant for treatment at a hospital, the respondent no longer qualifies as a "recipient of services" for the involuntary administration of psychotropic medication under the Code. *In re John N.*, 364 Ill. App. 3d 996, 998 (2006). Accordingly, we also reverse the trial court's involuntary medication order.

¶ 49                                                  CONCLUSION

¶ 50    For the foregoing reasons, we reverse the judgment of the circuit court of Kankakee County. However, there is no reason to remand this matter for further proceedings. These proceedings are concluded. If the State believes that the respondent remains in need of

20

involuntary commitment and should be given psychotropic medication against her will, it must initiate new proceedings in the circuit court. See *Barbara H.*, 183 Ill. 2d at 498; *Daryll C.*, 401 Ill. App. 3d at 757-58.

¶ 51        Reversed.

¶ 52        JUSTICE SCHMIDT, dissenting.

¶ 53        I respectfully dissent from the judgment. Although I echo the majority in stressing "the need for strict compliance with legislatively mandated procedural safeguards to protect and balance the competing interests of society and individuals subject to involuntary commitment," respondent has no legal basis for reversal. *Supra* ¶ 46. First, I disagree with the majority's view that appellate courts are free to disregard forfeiture rules to achieve what the court believes to be a just result. Second, reversible error must be based on more than "potential prejudice" as the majority states. *Supra* ¶ 36. Finally, the State's evidence substantially complied with sections 3-810 and 3-811 of the Code (405 ILCS 5/3-810, 811 (West 2014)).

¶ 54        Although some cases hold that forfeiture is a limitation on the parties and not the courts, our supreme court has advised against such a practice " 'when it would have the effect of transforming [the] court's role from that of jurist to advocate.' " *People v. Givens*, 237 Ill. 2d 311, 324 (2010) (quoting *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002)); see also *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 34.

¶ 55        In both civil and criminal cases, trial and appellate courts must follow the principle of party presentation: " 'That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' " *Givens*, 237 Ill. 2d at 323 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). "Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for

21

advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment, joined by Thomas, J.).

¶ 56    Based upon these principals, our supreme court has dictated that "while our case law is permeated with the proposition that waiver and forfeiture are limitations on the parties and not on the court, that principle is not and should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will." *Jackson*, 2012 IL 111928, ¶ 33.

¶ 57    Here, respondent failed to raise the alleged statutory violations below. Had she done so, any evidentiary omission or issue with the proofs could have been cured. Instead, we are left to fill in the blanks and predict whether the result would have been the same if the detaining police officers testified, or if Dr. Belford listed out every possible alternative treatment measure and why respondent would not benefit from such treatment. Overlooking our forfeiture rules in this case places the court far too close to an advocate's position by speculating what the evidence may or may not have shown. Accordingly, I would deem the issues forfeited and affirm.

¶ 58    Likewise, if reaching the merits, respondent failed to show prejudice. First, actual prejudice must be proven to warrant reversal. The section 3-606 (405 ILCS 5/3-606 (West 2014)) violation allegedly prevented respondent from calling the police officers who detained her immediately prior to being involuntarily admitted. However, there is no evidence indicating that the police officers would have testified in respondent's favor. Common sense suggests the opposite. Failure to follow procedures set forth in section 3-606 does not, by itself, deprive the plaintiff of any liberty interest. *Chathas v. Smith*, 884 F.2d 980, 987 (7th Cir. 1989).[3]

---

[3]"A state-created procedural right is not itself a liberty interest." *Chathas*, 884 F.2d at 987 (citing *McKinney v. George*, 726 F.2d 1183, 1190 (7th Cir. 1984) (holding that state-created procedural right is not a liberty interest contemplated by the Fourteenth Amendment).

22

Accordingly, respondent must show actual, not potential, prejudice for a section 3-606 violation to constitute reversible error.

¶ 59     The majority also finds that Dr. Belford's testimony did not substantially comply with sections 3-810 and 3-811. The majority recognizes that where, as here, a respondent fails to object to the absence of a written predispositional report and the legislative intent can be achieved by other means, strict compliance with section 3-810 is not required. *Supra* ¶ 41 (citing *Robinson*, 151 Ill. 2d at 134). Instead, substantial compliance through testimony, rather than a written report, is sufficient. *Robinson*, 151 Ill. 2d at 134. However, the majority concludes that Dr. Belford's testimony was totally noncompliant with the statute by not testifying as to every potential alternative treatment measure. *Supra* ¶¶ 43-44. But, Dr. Belford testified that respondent was not compliant with any outpatient treatment and would not voluntarily subject herself to treatment alternatives. Therefore, involuntary commitment was necessary.

¶ 60     This testimony sufficiently satisfies the mandates of sections 3-810 and 3-811. Dr. Belford was not required to identify and discuss every possible treatment alternative where respondent was not compliant with any outpatient treatment. Whether the doctors check no to each alternative treatment box or, more simply, check the "none of the above" box does not substantially affect their assessment of respondent's mental fitness. In sum, Dr. Belford's testimony sufficiently indicates that other treatment alternatives were considered in diagnosing respondent and recommending involuntary admission to a mental health facility. The State's evidence substantially complied with the statutes under the circumstances of this case. I would affirm.