**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180249-U

Order filed April 30, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* ALEX B., a Person Found Subject to Involuntary Admission and Involuntary Administration of Psychotropic Medication | ) ) ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Appeal Nos. 3-18-0249, 3-18-0250 Circuit Nos. 18-MH-9, 18-MH-11 |
| v. | ) ) | |
| Alex B., | ) ) | The Honorable Frank R. Fuhr, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice Schmidt concurred in the judgment.

**ORDER**

¶ 1     *Held*:  In two mental health cases that were consolidated on appeal, the appellate court found that the respondent's claim that the evidence was insufficient to establish that he was subject to involuntary admission and involuntary administration of psychotropic medication was moot and was not excused by any applicable exception to the mootness doctrine.  The appellate court, therefore, dismissed respondent's appeal as moot in each of the two consolidated cases.

¶ 2        In separate cases in the trial court, mental health professionals filed petitions to involuntarily admit respondent, Alex B., to a mental health center and to involuntarily administer psychotropic medications to respondent. After conducting separate hearings, the trial court granted both petitions. Respondent appeals in both cases, and the cases have been consolidated on appeal. We dismiss respondent's appeal as moot in each case.

¶ 3                                          I. BACKGROUND

¶ 4        Respondent was a 37-year-old man with over a 10-year history of mental health problems who lived in his mother and stepfather's basement. Despite his history of mental problems, respondent had apparently never been involuntarily committed or involuntarily medicated in the past. On April 17, 2018, respondent's mother called 9-1-1 after she found handwritten notes in respondent's room threatening to kill her and her husband (respondent's stepfather). When the police arrived, they found that respondent was intoxicated and was being combative. The officers eventually had to tase respondent to get him under control. Respondent was transported by the police to a mental health center for evaluation and treatment.

¶ 5        The following day, a crisis counselor for the mental health center filed a petition in the trial court to involuntarily admit (also referred to as involuntarily commit) respondent to the center for treatment. Attached to the petition were numerous supporting documents, including a one-paragraph narrative description of the information that the counselor had obtained about the current incident and about respondent's mental health history; a copy of the threatening notes that respondent had written; a certificate of examination that was completed by a social worker at the center; a history and physical examination report that was completed by the attending psychiatrist at the center, Dr. Rickey Wilson; a predispositional report prepared by Dr. Wilson; and a certificate of examination completed by Dr. Wilson. The petition and supporting

documents essentially alleged that respondent was a danger to himself or others (his mother and his stepfather) because he had over a 10-year history of mental illness (previously diagnosed with schizoaffective disorder), had been abusing alcohol, had written notes about killing his mother and stepfather, had shoved his mother into a wall a few days earlier, had cornered his mother in his room, and had to be tased by the police during the most recent incident due to his combative behavior.

¶ 6    About a week later, Dr. Wilson filed a second petition in a separate case in the trial court seeking to involuntarily administer certain specified psychotropic medications to respondent. Attached to the second petition (also referred to as an involuntary medication petition) was a written explanation of the recommended treatment of psychotropic medication. The written explanation listed the recommended treatment (long-acting injectable medication); the benefits, side effects, and other risks of the recommended treatment; the alternatives to the recommended treatment; and an assessment of respondent's decisional capacity with regard to psychotropic medications. At the bottom of the written recommendation form, a box was checked indicating that a copy of the form had been given to respondent and to any representative for respondent. The trial court appointed an attorney to represent respondent in the two court proceedings.

¶ 7    On April 30, 2018, the trial court held a separate hearing on each petition. Respondent was present in court for each hearing and was represented by his attorney. At the hearing on the involuntary commitment petition, Dr. Wilson was the only witness to testify for the State. Wilson testified that he was respondent's treating physician at the mental health center, that he initially examined respondent on April 18, 2020, and that he had seen respondent numerous times since that date. Wilson diagnosed respondent as suffering from a mental illness— schizoaffective disorder—and from alcohol abuse. Based upon his training and experience,

Wilson opined that respondent was a person who because of his mental illness was reasonably expected to engage in conduct placing himself or another in physical harm or in a reasonable expectation of being physically harmed, unless respondent was treated on an inpatient basis. When asked what behavior had been reported to him or that he had personally observed that led him to reach that conclusion, Wilson stated that respondent's mother reported that respondent had been pushing her around at home; that she and respondent's stepfather had found notes threatening to kill them, which they believed respondent had written; and that when the police were called, respondent was agitated and had to be tased by the police. Wilson noted further that when respondent was first brought to the center, he was agitated and was threatening to harm others. Respondent had since calmed somewhat, although he remained quite paranoid and delusional with feelings that people were out to hurt him in some way. Wilson had personally observed respondent getting agitated but had not seen respondent swing at anyone. Wilson felt that if respondent was released from the center untreated, he "significantly [had] the potential of hurting people in his family."

¶ 8        Wilson had developed a treatment plan for respondent and had considered the various treatment alternatives available in doing so. Wilson stated that respondent was quite delusional and was in need of psychiatric hospitalization. The treatment plan that Wilson developed for respondent was based upon Wilson's psychiatric education, training, experience, personal examination of respondent, and respondent's social history. In Wilson's opinion, respondent needed to be placed on a long-acting injectable medication to control his paranoia and delusions. Wilson noted that respondent had been on such medications in the past and had reportedly benefitted from those medications. Wilson described the goals of the treatment plan and stated that he was hoping to meet respondent's treatment needs within a 90-day time period. According

4

to Wilson, the least restrictive treatment alternative available for respondent was the mental health center. Although a residential facility was a less restrictive option, Wilson did not believe it was an acceptable alternative at that point because such a facility was not locked down and respondent could easily walk away from the facility and potentially harm someone.

¶ 9    On cross-examination, Wilson acknowledged that the decrease in respondent's aggressive behavior in the emergency room and at the mental health center coincided with the decrease in respondent's use of alcohol. Wilson clarified, however, that in his opinion, the decrease in respondent's aggressive behavior was due to respondent being a fairly intelligent person and quickly learning what behaviors were not acceptable, rather than from a decrease in respondent's alcohol use. Upon additional inquiry, Wilson stated that respondent had exhibited voiced delusions while at the center and had continued to talk about being poisoned and about various people in federal agencies plotting to get him.

¶ 10    Respondent testified in his own behalf at the involuntary commitment hearing and denied that he had any plans to hurt his mother or stepfather. Respondent stated that his relationship with his mother and stepfather was very close for the most part. The biggest issue that respondent and his mother and stepfather always had was that respondent liked to drink and to enjoy himself. When asked about hearing voices, respondent stated that the voices the doctor assumed was respondent talking to nobody could "be mimicked with top secret technologies" that he was "not at liberty to talk about in this meeting." Respondent believed that Dr. Wilson had a "personal vendetta" against him and stated that, "I feel a doctor that wants to put me on medication for his own profits is probably not the best solution for what his either diagnosis or misdiagnosis of me is." According to respondent, he was brought to the mental health center

because he was drunk and had an incident with his parents, which he could have resolved on his own, if his mother would not have made a phone call (presumably to 9-1-1).

¶ 11 After respondent's attorney had finished questioning respondent, the trial court asked respondent some questions of its own. Among other things, the trial court asked respondent whether he had written the threatening notes that respondent's mother and stepfather had found. The following conversation ensued:

"THE COURT: Did you write that note indicating—

THE RESPONDENT: I mean this is a national security issue and he wants to turn it into a mental health issue.

THE COURT: Did you write the note indicating that you were going to kill your stepfather and your mother.

THE RESPONDENT: That is a night that I drank a lot of alcohol that night, and I will not confirm or deny I did that, and if I did that, it's because it was out of irritation and not an actual desire to do so."

¶ 12 At the conclusion of the involuntary commitment hearing, the trial court granted the State's petition, finding that respondent suffered from a mental disease, schizoaffective disorder, and that at the present time, respondent was in need of inpatient hospitalization because if respondent was released before he was stabilized, he would be a danger to himself or others. The trial court concluded, therefore, that the State had proven by clear and convincing evidence that respondent was subject to involuntary admission on an inpatient basis. Accordingly, the trial court entered a written order involuntarily committing respondent to the mental health center for a period not to exceed 90 days. See 405 ILCS 5/3-813(a) (West 2018).

¶ 13     Immediately thereafter, the trial court held a hearing on the petition for involuntary medication. Again, Dr. Wilson was the only witness to testify for the State. Wilson testified that he was respondent's treating physician at the mental health center and that he had diagnosed respondent with schizoaffective disorder, a serious mental illness. According to Wilson, due to respondent's mental illness, respondent's ability to interact effectively with others in the mental health unit had shown a deterioration. Although respondent had exhibited threatening behavior prior to admission to the center and for the first few days thereafter, he was no longer doing so and was only making accusations that people were out to hurt him in some way. Respondent's symptoms had been present throughout his stay at the center and for at least the past 8 to 10 years.

¶ 14     The treatment plan that Wilson proposed was to have respondent remain at the mental health center and to start respondent on a long-acting injectable medication to help maintain respondent's compliance. Wilson described in detail the medication or medications he was recommending, the dosages he was recommending, other medications that could potentially be used in the alternative and the dosages of those medications, the person who would be responsible for administering the medications, whether respondent had previously taken any of the medications and the results of respondent doing so, the less restrictive treatment alternatives that Wilson had considered, whether respondent lacked the capacity to make a reasoned decision about his treatment, and the testing that would be done for the safe and effective administration of the medications. During his testimony, Wilson confirmed that he had advised respondent both orally and in writing as to the benefits and risks of the treatment and that he had given respondent a written copy of the warnings on the medications that he was proposing for respondent. Wilson stated that he had also tried to discuss the risks, benefits, and side effects of

7

the treatment with respondent. A written copy of the risks and benefits was admitted as an exhibit at the hearing without objection from respondent, although it was apparently not made part of the record on appeal. When Wilson was asked in court whether he had advised respondent of the alternatives to any proposed treatment, Wilson stated, "I believe I did."

¶ 15 On cross-examination, Wilson acknowledged that respondent's threatening behavior had lessened since respondent had been in the mental health center and that it had done so largely without the administration of psychotropic medication.

¶ 16 On re-direct examination, Wilson opined that without the recommended course of treatment, the nature of respondent's illness was such that people with respondent's illness would deteriorate over time and would most likely revert into a much more aggressive state.

¶ 17 Respondent testified in his own behalf at the involuntary medication hearing. During his testimony, respondent stated that he had considered the risks of taking the medications. According to respondent, he had taken some of the recommended medications for a couple of months in the past in an oral version and they did not work for him. Respondent believed that Dr. Wilson wanted to use him as a test subject. Respondent stated that he was brought into the mental health center because of an alcohol issue and that it was now being turned into something else.

¶ 18 Respondent suggested during his testimony that Dr. Wilson was receiving some type of benefit for prescribing the medications to respondent, stating:

> "I have the ability to make people millions and millions of dollars and Dr. Wilson wants to keep me chained up in a—in his own facility so he can make money based on controlling me."

¶ 19 A few moments later, respondent stated further:

"I have lived with who I am for 37 years. I feel I should be in charge of my own treatment and not allow a man whose known me for 12 days to be in charge of it because that—it shows a lack of professional understanding of letting the patients be in charge of their own treatment.

I used to run marathons. I have such an IQ it got classified. I make a lot of intelligent agencies money and I help them with things without asking for anything. It is my belief that Dr. Wilson has the intelligence alliance that he is not telling me and he was ordered to put me on these medications."

¶ 20 Dr. Wilson was recalled to the witness stand, and he confirmed that he was not employed by any other private or public organization, that he did not have any economic interest in any company that produced psychotropic medications, and that no public or private entity had contacted him with instructions about what to do with respondent.

¶ 21 After the parties had finished their questioning, the trial court asked respondent some questions of its own. The following conversation took place:

"THE COURT: Mr. [Respondent], do you feel like you have schizoaffective disorder?

THE RESPONDENT: No.

THE COURT: And that is what you are basing your decision on refusing the meds?

THE RESPONDENT: I feel that spiritual people in today's society are not valued like they used to be. Five hundred years ago they used to work with kings and queens. Nowadays they get thrown on meds."

¶ 22 At the conclusion of the hearing, the trial court granted the petition for involuntary medication. In doing so, the trial court commented that respondent did not think he had schizoaffective disorder and that respondent's belief that he did not have the condition made it impossible for respondent to render a reasoned decision as to whether to take the medication, so the trial court had to make the decision for respondent. The trial court found, therefore, that the State had proven by clear and convincing evidence that respondent was subject to the involuntary administration of psychotropic medication. Accordingly, the trial court entered a written order allowing Dr. Wilson or other staff members at the center to involuntarily administer medication to respondent. The involuntary medication order was to be in effect for a period not to exceed 90 days. See 405 ILCS 5/2-107.1(a-5)(5) (West 2018).

¶ 23 Respondent appealed in both cases. The cases were consolidated on appeal by agreement of the parties.

¶ 24                                   II. ANALYSIS

¶ 25 On appeal, respondent argues that the trial court erred in granting the two mental health petitions. Respondent asserts that the trial court's rulings misinterpreted, misapplied, and violated the Code. More specifically, respondent contends first that the trial court should not have granted the involuntary commitment petition because the State failed to prove by clear and convincing evidence that respondent was a person subject to involuntary admission as required by the Code. Respondent maintains that the State's evidence was lacking because: (1) the State's entire case was based upon the testimony of Dr. Wilson and upon Dr. Wilson's opinion that respondent was reasonably expected to be a significant danger to his mother and stepfather if he was not hospitalized on an inpatient basis; (2) Dr. Wilson's testimony/opinion in that regard was cursory, was not supported by the evidence, and relied primarily upon hearsay information; (3)

10

the State failed to call to testify any of the underlying witnesses who had provided the hearsay information upon which Dr. Wilson relied; (4) the State failed to present an adequate factual evidentiary basis to support Dr. Wilson's opinion; and (5) any information elicited by the trial court in questioning respondent about whether he wrote the threatening notes should not be considered since that information was not elicited by the State and was improperly elicited by the trial court acting as an advocate in the proceeding. Second, respondent contends that the trial court also should not have granted the involuntary medication petition because the State failed to prove that respondent was provided with written information about less restrictive alternatives to psychotropic medications as required by the Code. For those reasons, respondent asks this court to overturn the trial court's rulings granting the two mental health petitions.

¶ 26 The State argues that the trial court's rulings were proper and should be upheld. The State asserts that it met its burden in the trial court to prove each petition, that the trial court's rulings to that effect were well supported by proper evidence, and that the trial court did not act improperly in questioning respondent at the involuntary commitment hearing. In making those assertions, the State contends that respondent's claims on appeal are not about the interpretation or application of the Code as respondent suggests but, rather, are merely about the sufficiency of the evidence. For all the reasons set forth, the State asks that we affirm the trial court's ruling on each petition.

¶ 27 Before we proceed any further in our review, we must first determine whether there is an exception to the mootness doctrine that would apply in this case that would allow us to reach the merits of the parties' arguments on appeal. The two mental health orders at issue in this case were limited in duration to 90 days and have long since expired. Thus, there is no question—and no dispute between the parties—that the underlying issues in the two consolidated cases are now

11

moot.  See *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006) (indicating that an appeal is moot if it presents no actual controversy or if the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effective relief to the complaining party); *In re Alfred H.H.*, 233 Ill. 2d 345, 350-51 (2009) (recognizing in a similar case that the underlying question of whether involuntary commitment and medication orders were valid was moot because the 90-day time period during which the orders were in effect had long since passed and the respondent could not be held involuntarily or forced to take medication against his will unless new petitions were filed and new hearings conducted).  It is well settled that Illinois courts will not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided.  See *Alfred H.H.*, 233 Ill. 2d at 351.  Therefore, unless an exception to the mootness doctrine applies in this case, we will not reach the merits of the parties' arguments.

¶ 28       Whether an exception to the mootness doctrine applies is a question of law, which the appellate court reviews *de novo*.  *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 13.  There is no general exception to the mootness doctrine for mental health cases.  *Alfred H.H.*, 233 Ill. 2d at 355.  Instead, courts should evaluate mental health cases using a case-by-case approach to determine whether one of the three recognized exceptions to the mootness doctrine applies—the public interest exception, the capable of repetition yet evading review exception (capable of repetition exception), and the collateral consequences exception—and must consider those exceptions in light of the facts and claims raised.  See *id.* at 364.  The exceptions to the mootness doctrine are to be construed narrowly.  *J.T.*, 221 Ill. 2d at 350.  For a particular exception to apply, the complaining party must make a clear showing that each element of that exception is present.  See *id.*

12

¶ 29    In this particular case, respondent argues that the capable of repetition exception applies. The capable of repetition exception has two elements that the complaining party must prove: (1) that the challenged action is too short in duration to be fully litigated prior to its cessation; and (2) that there is a reasonable expectation that the same complaining party would be subjected to the same action again. *Alfred H.H.*, 233 Ill. 2d at 358; *Vanessa K.*, 2011 IL App (3d) 100545, ¶ 14. Here, the parties agree that the first element has been satisfied due to the relatively short 90-day duration of the two orders at issue. Thus, the only remaining question as to whether the exception applies is the second element—whether there is a reasonable expectation that respondent will personally be subject to the same action again.

¶ 30    To establish the existence of the second element of the capable of repetition exception, respondent must show that there is a substantial likelihood that the issue presented in the instant case, and any resolution thereof, will have some bearing on a similar issue presented in a subsequent case involving the respondent. See *Alfred H.H.*, 233 Ill. 2d at 360. "For example, if the respondent's appeal raises a constitutional issue or challenges the trial court's interpretation of a statute, the exception applies because the court's resolution of [those] issues could affect the respondent in subsequent commitment proceedings." *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 27. On the other hand, appeals that merely challenge the sufficiency of the evidence in a particular case will not satisfy the second element of the exception. *Id.*

¶ 31    Upon reviewing respondent's arguments and the facts in the present case, we find that respondent failed in his burden to prove the second element of the capable of repetition exception. Although respondent initially categorizes his arguments on appeal as claims that the trial court misinterpreted or misapplied the Code, a deeper look at the substance of respondent's arguments shows that respondent is really attacking the sufficiency of the evidence—that the

13

State failed to prove by clear and convincing evidence that respondent was a person subject to involuntary commitment and that respondent had been given written information about less restrictive alternatives to psychotropic medications. Respondent does not claim that any of the statutes involved are unconstitutional, and neither the trial court nor this court was called upon to interpret any provision of those statutes. See *Alfred H.H.*, 233 Ill. 2d at 360 (indicating, although somewhat implicitly, that the capable of repetition exception will apply where the respondent raises a constitutional issue or challenges the trial court's interpretation of a statute because the court's resolution of those issues could affect the respondent in subsequent commitment proceedings); *Amanda H.*, 2017 IL App (3d) 150164, ¶ 27 (same). Rather, respondent merely contends here that the State failed to meet its burden of proof in each of the consolidated cases. Considering that argument and the facts before us, we cannot say that there is a clear indication of how a resolution of the issues raised in the two consolidated cases could be of use to respondent in a future litigation as any future litigation would be based upon new petitions, new hearings, new evidence, and an assessment of whether the State met its burden of proof in those cases. See *Alfred H.H.*, 233 Ill. 2d at 360 (making a similar statement about the argument raised in that case).

¶ 32 In addition, and contrary to other mental health cases where courts have found that the capable of repetition exception applies, this is apparently the first time that respondent has been involuntarily committed and involuntarily medicated, even though respondent has had mental health problems for over the past 10 years. We cannot say, therefore, that it is reasonably likely that respondent will be involuntarily committed or medicated again in the future. Compare *In re Barbara H.*, 183 Ill. 2d 482, 492 (1998) (finding that the second element of the capable of repetition exception had been satisfied where the respondent had a prior history of mental illness

14

and hospitalization, including involuntary hospitalization, such that it was reasonable to expect that the same action taken against the respondent in that case might confront the respondent again in the future); *In re Robin C.*, 395 Ill. App. 3d 958, 963 (2009) (ruling that the second element of the capable of repetition exception had been satisfied where the respondent had suffered from schizophrenia and had been involuntarily committed on prior occasions such that there was a reasonable expectation that respondent would be subject to the same action again in the future).

¶ 33 Based upon the arguments respondent has made on appeal, the facts of the cases before us, and the established law in this area, we must conclude that respondent's arguments in the two consolidated cases are moot and that respondent has failed to establish that any exception to the mootness doctrine applies.  See *Alfred H.H.*, 233 Ill. 2d at 360.  We, therefore, dismiss respondent's appeal as moot in each of the two consolidated cases.  See *id.* at 364.

¶ 34        III. CONCLUSION

¶ 35 For the foregoing reasons, we dismiss respondent's appeal as moot in each of the two consolidated cases.

¶ 36 Appeals dismissed.