Nos. 2-21-0029 & 2-21-0030 cons.
Opinion filed January 20, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* DANIEL A., Alleged to Be a Person Subject to Involuntary Admission and Involuntary Medication | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) ) ) | Nos. 20-MH-11 20-MH-12 |
| (The People of the State of Illinois, Petitioner-Appellee, v. Daniel A., Respondent-Appellant). | ) ) ) | Honorable James S. Cowlin, Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgenson concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Daniel A., appeals from the judgment of the trial court involuntarily committing him to emergency inpatient admission at Northwestern Medicine Woodstock Hospital (Northwestern) and involuntarily administering psychotropic medication. Respondent contends that the petition for involuntary admission (No. 20-MH-11) and the petition for involuntary medication (No. 20-MH-12) were heard in the same hearing, in violation of section 2-107.1(a-5)(2) of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2-107.1(a-5)(2) (West 2020)). Additionally, respondent contends that the State failed to file a predispositional report, which is required to aid the trial court in determining the least restrictive setting for the respondent's commitment, in violation of section 3-810 of the Code (*id.* § 3-810). Lastly,

respondent contends that he received ineffective assistance when counsel failed to object to the State's lack of statutory compliance. For the reasons that follow, we reverse the judgment of the trial court.

¶ 2                              I. BACKGROUND

¶ 3     On November 25, 2020, the State sought involuntary inpatient admission of respondent pursuant to section 3-600 of the Code (*id.* § 3-600). The petition alleged that respondent is "a person with a mental illness who because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed" and that he is "in need of immediate hospitalization for the prevention of such harm." These assertions were based on (1) respondent's presentation at Northwestern as "paranoid, irritable, argumentative, and verbally aggressive" and (2) respondent's own report that he and his father got into an altercation over a cell phone that respondent was holding. During this altercation respondent pushed his father, who then fell onto some potted plants and broke a window. Following this incident, respondent intentionally scratched his own arm several times with his fingernails.

¶ 4     A hearing took place on December 4, 2020. Respondent's mother, Nancy, testified that at the time of the hearing respondent lived with her and her husband, respondent's father. Nancy first became concerned with respondent's behavior approximately nine years ago, when respondent was a junior in college. Respondent called home a few weeks after winter break and reported he felt scared because he felt that people were watching him through the windows in his apartment, he was hearing his computer speak to him, and he was hearing people speak to him through the computer. Respondent asked his father to visit him, which occurred.

¶ 5    After respondent finished school, he returned home to live with his parents. Around December 2013, Nancy observed respondent stay awake for a couple of days, pace around the house, speak with a British accent, and drink alcohol. Respondent accused Nancy of having an affair in 2014, and an argument ensued. Nancy, scared and worried that it would escalate, began to dial 911 when respondent took her glasses off her face so she could not complete the call. As the police arrived, respondent went out into the backyard and the police could not find him; no arrest was made. Respondent worked cleaning houses for a few years after he returned home, and then he got a job that related to his degree—engineering—in 2018. Respondent lost that job in February 2020. From that time, Nancy observed that respondent spent a lot of his time pacing both inside and outside the house, failed to complete tasks, and had conversations and laughed when there was no one else present.

¶ 6    On the night of November 23, 2020, respondent became upset with Nancy when she could not recall the type of car that a neighbor was driving when the neighbor stopped to talk to her earlier that day. Respondent became argumentative. Respondent's father took out his phone and began recording, and respondent grabbed the phone from his father. When his father reached to take his phone back, respondent pushed him and he fell backwards into a bay window, knocking over planters. Respondent yelled and screamed at his parents as his father got up from the fall. He continued ranting, and Nancy was scared by this behavior; she called 911. She managed to stay calm while on the phone with dispatch and stayed on the phone until the police arrived.

¶ 7    Nancy noticed a decline in respondent's behavior from the episode when he was in college up until the matter resulting in these proceedings. Respondent appeared to cycle between (1) times of heightened agitation where he paced a lot and (2) times of relative calm where he slept a lot. Nancy believed respondent needed medical help from doctors while he was in Northwestern, and

she also believed he should not be released without treatment. She and respondent's father would continue to be a resource for him, but she did not want respondent living in her home unless he was medicated, stable, and receiving professional help.

¶ 8    Dr. Elizabeth McMasters, an attending psychiatrist and the director of the behavior health department at Northwestern, testified to her role in treating respondent. McMasters first saw respondent on November 25, 2020, when he was transferred to Northwestern from a different hospital where he had been taken by ambulance following the incident at his parents' home. She had examined respondent six times since then. During the first exam, he had an elated, elevated mood, spoke loudly and rapidly, and was irritable, argumentative, and angry about being hospitalized. McMasters explained that she thought he was presenting in a manic state, but respondent did not agree with her diagnosis. Respondent talked about his belief that his father was trying to poison him through their well water and through growing vegetables over a septic field. McMasters considered such thoughts "delusions" and classified respondent  as consistently grandiose throughout their meetings. During his time at Northwestern, respondent at times had been quite hostile and verbally aggressive, and at times he had been calm and did not use a raised voice. Respondent was observed talking, laughing, and conversing with himself.

¶ 9    As part of his treatment, McMasters reviewed respondent's behavior and treatment with other hospital staff, social workers, and other hospital employees and also reviewed his medical history. Another doctor, Dr. Alkhouri, also met with respondent, and Alkhouri agreed with McMasters's assessment. McMasters's formal diagnosis of respondent was that he has bipolar I disorder and that he had a manic episode with psychotic features. Due to this, McMasters was concerned that respondent was at risk of harm to his parents and potentially at risk of harm to

himself. She classified his prognosis as "very poor" if he was not admitted, meaning respondent could pose a threat to himself or others.

¶ 10     On petition No. 20-MH-11 (involuntary admission), McMasters considered less restrictive services for respondent, but she was concerned with his agitated and aggressive behavior at the emergency room and upon being admitted. Furthermore, because he was not taking medication, she did not believe it was appropriate to treat him in an outpatient setting. Bipolar mania is a condition that requires medication intervention and cannot be treated without a medical treatment.

¶ 11     McMasters then testified concerning medication, in case No. 20-MH-12 (involuntary medication). She testified that she examined respondent six times, for 10 to 15 minutes each time, and, based upon a reasonable degree of psychiatric certainty, respondent's mental illness was causing a deterioration in his ability to function. She believed that he lost his job in engineering based on his illness. He exhibited threatening behavior and aggression and was drinking heavily, which impaired his impulse control. McMasters recommended a 90-day period of commitment, though she thought he likely would not need to stay that long. McMasters sought authorization to administer three separate medications. The first, haloperidol, was used to treat mania. The second, paliperidone (brand name Invega), was an antimanic, antipsychotic medication that would be administered if there was an allergy or adverse reaction to haloperidol. The third, benztropine, was for medication side effects and would be administered as needed in response to the first two options. She outlined in detail the dosages and timeline for administering the medication. McMasters believed the benefits of any of these medications outweighed the risks to respondent, and both the benefits and the risks were provided to respondent in written form. Respondent did not believe he had an illness and did not want to take medication. McMasters's medical opinion

was that respondent did not understand that he had a mental illness. Further, respondent's paranoia and distrust of authority in general interfered with his perception of reality.

¶ 12    On cross-examination, McMasters stated that she did not know whether the State or respondent's counsel had access to the notes about respondent since he had been in the hospital. She received most of her information about respondent's prior mental health history from Nancy and stated that he had not been hospitalized before the present case.

¶ 13    Respondent testified that he holds a degree in engineering physics from the University of Illinois. He began working as a manufacturing engineer in 2018 at an hourly rate of $18 per hour and later earned a salary of $60,000 per year, which was his salary at the time his employment ended in February 2020. At the time of the hearing, respondent had one checking account with more than $2000, and one credit card with an $8000 credit line available. He had a valid driver's license and a vehicle in his name for which he owed $1000, but had made payments in advance and did not have a payment due until March 2021. He had minimal living expenses aside from food. Respondent occasionally fasted as part of his health routine and practiced yoga. He described his overall physical health as excellent, and he testified that he rarely drank alcohol, but he did get intoxicated when he drank, and he used legally purchased marijuana daily.

¶ 14    Respondent met with a psychiatrist when he was in college. The psychiatrist did not prescribe any medication or make a diagnosis. Respondent recalled "very little" about the encounter and believed that the psychiatrist did not indicate that she thought respondent had much of a problem. They discussed his beliefs, which included that he did not generally believe in antipsychotic medications and that he considered them overprescribed. Respondent was extremely opposed to taking psychotropic medication. He understood that McMasters believed there were benefits to the medication, but he was opposed to medication after witnessing the effects on his

siblings and other patients in the hospital; he believed medication would do him far more harm than good. If he were released, respondent believed he could get a motel room or ask his sister if he could spend a few nights at her place.

¶ 15    Respondent recalled the events of November 23, 2020. He had been drinking, he believed his father was intoxicated and hostile, and he believed his mother was mostly sober. Respondent picked up his father's phone, but he said that he did not know why and that it was out of impulse. His actions angered his father, who cornered him and then reached for his throat. At that point, respondent pushed him away. His relationship with his parents was strained at times, given that he was a 30-year-old man living with his parents. Respondent and his parents had arguments, but the majority of the time their relationship was pretty good. Respondent contributed to the household by cooking and cleaning. Respondent wanted to have a conversation with his parents and badly wanted to go home.

¶ 16    After the hearing, the trial court made two separate findings, one as to each particular petition. It found by clear and convincing evidence that respondent was subject to involuntary admission on an inpatient basis as a person with a mental illness who, because of his illness (bipolar I), was reasonably expected to place himself or another in physical harm or in reasonable expectation of being physically harmed unless he was under direct inpatient treatment. The court found McMasters to be a credible witness and found that inpatient treatment at Northwestern was the least restrictive means of treatment. Next, the court found by clear and convincing evidence that respondent had a serious mental illness (bipolar I) and refused psychotropic medication as treatment. The court found McMasters's testimony credible on the matters concerning available medications. Accordingly, the court ordered the psychotropic medication haloperidol be administered to respondent, with paliperidone as an alternative and benztropine if necessary. The

court ordered hospitalization not to exceed 90 days, and the facility director of Northwestern was ordered to file a treatment plan within 30 days. The matter was continued 30 days for status on the dispositional report. On January 5, 2021, the petitions for involuntary admission and involuntary medication were dismissed, as respondent had been released from the hospital. We granted respondent leave to file a late notice of appeal.

¶ 17                                    II. ANALYSIS

¶ 18    Initially, we note that this case is moot because the December 4, 2020, order involuntarily committing respondent expired by its own terms no later than March 4, 2021. See *In re Alfred H.H.*, 233 Ill. 2d 345, 350 (2009). As a general principle, we will not decide moot questions, give an advisory opinion, or consider an issue where the outcome will not or cannot be affected no matter what is decided. *Id.* at 351. However, there are three exceptions to mootness that apply to cases involving involuntary commitment. *Id.* The questions presented when considering whether an exception to mootness applies are purely legal, and we review legal issues *de novo*. *Id.* at 350. The three exceptions are public interest (*id.* at 355), harms capable of repetition yet avoiding review (*id.* at 358), and collateral consequences (*id.* at 361). Respondent contends that all three exceptions apply. Upon review, we determine that the collateral consequences exception applies.

¶ 19    "The collateral consequences exception to mootness allows for appellate review, even though a court order *** has ceased, because a plaintiff has suffered, or [is] threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." (Internal quotation marks omitted.) *In re L.K.*, 2019 IL App (1st) 163156, ¶ 19 (quoting *In re Alfred H.H.*, 233 Ill. 2d at 361). "Application of the collateral consequences exception 'requires *** that continuing "collateral consequences" *** be either proved or presumed.' " *Id.*

Additionally, "[c]ollateral consequences must be identified that could stem solely from the present adjudication." (Internal quotation marks omitted.) *In re Rita P*., 2014 IL 115798, ¶ 34.

¶ 20 Respondent contends that, pursuant to the Professional Engineering Practice Act of 1989, a person who has been found subject to involuntary admission is affected by collateral legal consequences affecting his career. 225 ILCS 325/24(b) (West 2020). Pursuant to section 24(b),

> "[t]he determination by a circuit court that a registrant is subject to involuntary admission or judicial admission as provided in the Mental Health and Developmental Disabilities Code operates as an automatic suspension. Such suspension will end only upon a finding by a court that the patient is no longer subject to involuntary admission or judicial admission, the issuance of an order so finding and discharging the patient, and the recommendation of the Board to the Secretary that the registrant be allowed to resume practice." *Id.*

Respondent's involuntary commitment serves as an automatic suspension, and although his release from the hospital renders him eligible to be reinstated, it still obligates him to make an overt request seeking an affirmative recommendation of the board that he be allowed to resume practice. His career prospects are clearly impacted.

¶ 21 The respondent in *In re Alfred H.H.*, had multiple prior involuntary commitments as well as a felony conviction. *In re Alfred H.H.*, 233 Ill. 2d at 363. Therefore, with that respondent's established history, there were no new collateral consequences that could be attributed to a single subsequent involuntary commitment order. Those facts are distinguishable from the present case where respondent has no prior involuntary commitment orders and no prior professional licensure suspension. The legal consequence of automatic suspension is directly tied to this adjudication. Although there are presumably other ways to have one's license suspended, this particular

suspension stems solely from these proceedings. Further, as we recognize the considerable effort in obtaining an engineering physics degree, we are even more attuned to the negative impact that suspension of the professional license may have on respondent. As we determine that the collateral consequences exception applies, we need not analyze whether the other exceptions to mootness apply.

¶ 22    Respondent contends that the trial court erred when it allowed testimony from McMasters for both the petition for involuntary admission (No. 20-MH-11) and the petition for involuntary medication (No. 20-MH-12) in the same hearing instead of conducting two separate hearings, as required by the Code (405 ILCS 5/2-107.1(a-5)(2) (West 2020)). Pursuant to the statute, the hearing for administration of psychotropic medication "*shall* be separate from a judicial proceeding held to determine whether a person is subject to involuntary admission but may be heard immediately preceding or following such a judicial proceeding." (Emphasis added.) *Id.* Here it is clear that the State requested to continue its questioning of McMasters after it concluded its examination pertaining to the involuntary admission petition:

> "MR. GOODMAN [(ASSISTANT STATE'S ATTORNEY)]: At this time, your Honor, the State rests with respect to the involuntary admission petition. But as I said, I have further questions regarding the treatment. So I—
>
> THE COURT: Well, at this point in time, the witness would be tendered to Mr. Mourelatos for cross examination, unless there is some agreement between you and Mr. Mourelatos to take Dr. McMasters' testimony for both petitions and then have Mr. Mourelatos cross on both. I don't know how the respondent wants to proceed. Mr. Mourelatos?

MR. MOURELATOS [(RESPONDENT'S ATTORNEY)]: Your Honor, for judicial efficiency, if we can ask Dr. McMasters questions pertaining to the involuntary treatment and I can collectively then cross examine her.

THE COURT: The that would be fine. The Court would allow that to occur."

Then, in calling its next witness, Nancy, the State again referred to its examination pertaining to the involuntary admission petition and the involuntary medication petition:

"THE COURT: All right. Thank you. So then, Mr. Goodman, do you have another witness to call as pertains to either petition?

MR. GOODMAN: Yes, I do. I would call Nancy ***, your Honor.

THE COURT: All right. And I will bring her in and I assume this is pertaining to the involuntary admission petition?

MR. GOODMAN: That's correct. It dovetails into both, your Honor. So if we could do sort of the same comprehensive testimony for both petitions.

THE COURT: All right. One moment."

¶ 23    The record shows that the trial court acknowledged the intermingling of the testimony of witnesses on both petitions and allowed it, without comment or citing any reason to do so. This indiscriminate allowance is tantamount to ignoring the statutory requirements. Although we are sympathetic to deviations that were required by the pandemic, in this case, compliance with the statute was no more burdensome being conducted over Zoom than it would have been in a courtroom. Recalling a witness via Zoom is arguably less cumbersome than doing so in person, and a witness who is available virtually would not have to appear in-person, which could consume many hours of her day.

¶ 24   The State points to the Third District's holding in *In re Alaka W.*, 379 Ill. App. 3d 251, 275 (2008), in which it noted its belief that *In re Barbara H.*, 183 Ill. 2d 482, 498 (1998), is "an expression of the supreme court's *preference* for strict compliance with the statutes related to involuntary commitment and involuntary administration of psychotropic medication." (Emphasis added.) *In re Alaka W.*, 379 Ill. App. 3d at 275. The State improperly attributes to the word "preference" a leniency that we do not believe is intended. *In re Alaka* goes on to quote *In re C.E.*, 161 Ill. 2d 200, 214 (1994), stating that "[r]equiring strict compliance with statutory procedural safeguards is also necessary because of the '[f]ederal constitutionally protected liberty interest to refuse the administration of psychotropic drugs.' " *In re Alaka*, 379 Ill. App. 3d at 275 (quoting *In re C.E.*, 161 Ill. 2d at 214); see *In re Cynthia S.*, 326 Ill. App. 3d 65, 69 (2001) ("In mental health cases, strict compliance with statutory provisions is compelling, as liberty interests are involved. *** [P]rocedural safeguards are not mere technicalities, but essential tools to safeguard liberty interests ***. [Citation.] *** [P]rocedural safeguards are construed strictly in favor of the respondent. [Citation.] The failure to comply with procedural rules requires the reversal of court orders authorizing involuntary treatment."). *In re Alaka*, also quotes *In re Barbara H.*, stating that "[t]he court noted that '[b]ecause involuntary administration of mental health services implicates fundamental liberty interests [citation], statutes governing the applicable procedures should be construed narrowly' and held that where those statutes are all but ignored, the appellate court is correct to reverse the circuit court's judgments." *In re Alaka*, 379 Ill. App. 3d at 274-75 (quoting *In re Barbara H.*, 183 Ill. 2d at 498). Accordingly, we hold that the statute requiring separate hearings requires strict compliance and that it was reversible error to allow intermingled testimony on both petitions, essentially combining the hearings for involuntary commitment and involuntary medication.

¶ 25    Respondent next contends that the State's failure to file a predispositional report, in violation of the Code, is reversible error. See 405 ILCS 5/3-810 (West 2020). The purpose of the report is to provide the trial court with pertinent information that will help it determine the least restrictive means of treatment.

> "It is clear from a reading of section 3-810 as a whole that its purpose is to provide trial judges certain information necessary for determining whether an individual is subject to involuntary admission to a mental health facility. Other purposes of the statute are to protect against unreasonable commitments and patient neglect, and to ensure adequate treatment for mental health care recipients." *In re Robinson*, 151 Ill. 2d 126, 133 (1992).

However,

> "[w]here a respondent fails to object to the absence of a predispositional report, strict compliance with section 3-810 is required only when the legislative intent cannot otherwise be achieved. (See *Splett*, 143 Ill. 2d at 233-34). Under these circumstances, we believe that oral testimony containing the information required by the statute can be an adequate substitute for the presentation of a formal, written report prepared by the facility director or some other person authorized by the court." *Id.* at 134.

¶ 26    First, we note that counsel for respondent made no objection to the absence of the predispositional report. Therefore, so long as the legislative intent of section 3-810 can be achieved, the failure to provide this report will not constitute reversible error. See *In re E.L.*, 316 Ill. App. 3d 598 (2000). Second, to determine if the oral testimony of McMasters was sufficient to accomplish the legislative intent, we consider what information is required in a predispositional report.

¶ 27    Pursuant to section 3-810 of the Code, the report shall include (1) information on the appropriateness and availability of alternative treatment settings, (2) a social investigation of the respondent, (3) a preliminary treatment plan, and (4) any other information that the court may order. 405 ILCS 5/3-810 (West 2020). "The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment." *Id.*

¶ 28    We will address McMasters's testimony as it applies to the four requirements listed above, in that order. As to the first requirement, she testified that there was no other treatment setting available because respondent's diagnosis required medication, which he refused. As to the second requirement, McMasters conducted several interviews with respondent since he arrived at Northwestern and she was familiar with his beliefs concerning his own health; she also received information about respondent's family and the impact his behavior and mental illness had on them, from multiple conversations with Nancy. Finally, she reviewed his prior medical history. As to the third requirement, McMasters recommended medication to treat respondent's acute symptoms, including an alternative and a drug to mitigate any side effects. She prepared a dosage schedule for those drugs. Lastly, she noted that, although she recommended a 90-day period of commitment, she expected that less time would be required to treat respondent. Finally, as to the fourth requirement, the trial court had not ordered any specific information.

¶ 29    We note that the trial court ordered the predispositional report for review at the 30-day status hearing, but respondent was released by that time. Although having the report at that time would ensure that the appropriate level of care was being provided to respondent and that inpatient treatment was still the least restrictive means of treatment, best practice is to have a completed written report available to the trial court at the earliest possible opportunity.

¶ 30    Considering that McMasters's testimony included the appropriateness and availability of alternative treatment settings and medication and that other testimony concerned respondent's social background, the evidence was adequate to advise the trial court of the relevant information pertaining to the least restrictive means of treatment. The failure to render a predispositional report was harmless error.

¶ 31    Respondent's final contention is that he received ineffective assistance when counsel failed to object to the various departures from statutory requirements. Because we have held that the allowance of combined testimony for both petitions was in violation of the Code and was reversible error, counsel's failure to object to that same violation is deficient performance. Respondent was prejudiced, as the outcome of the hearing could have been different had these objections been made. Because we have held that the failure to produce a predispositional report was error, counsel's failure to object to this omission was also questionable. However, as the lack of the predispositional report was harmless error under these circumstances, as respondent was not prejudiced. Nevertheless, counsel should remain diligent to enforce the statutory directives.

¶ 32                                    III. CONCLUSION

¶ 33    For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed.

*In re Commitment of Daniel A.*, **2023 IL App (2d) 210029**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, Nos. 20-MH-11, 20-MH-12; the Hon. James S. Cowlin, Judge, presiding. |
| **Attorneys for Appellant:** | Veronique Baker and Laurel Spahn, of Illinois Guardianship and Advocacy Commission, of Hines, for appellant. |
| **Attorneys for Appellee:** | Patrick Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |